**UNITED STATES COURT OF APPEALS**

**Filed 12/18/96**

**TENTH CIRCUIT**

————————————

BANCAMERICA COMMERCIAL
CORPORATION, a Pennsylvania corporation;
ASARCO, INC.,

    Plaintiffs-Appellees-Cross-Appellants,      Nos. 95-3385 & 95-3396

v.

MOSHER STEEL OF KANSAS, INC., a
Kansas corporation; TRINITY INDUSTRIES,
INC., a Texas corporation,

    Defendants-Appellants-Cross-Appellees.

————————————

Before **PORFILIO, TACHA** and **BRORBY**, Circuit Judges.

————————————

**ORDER**

————————————

On November 13, 1996, we issued an opinion in these cases affirming the judgment of the district court, with the exception of reversing and remanding for the granting of prejudgment interest to Plaintiffs in accordance with 42 U.S.C. § 9607(a) (1994). Nos. 95-3385, 95-3396, 1996 WL 657870 (10th Cir. Nov. 13, 1996).

Our opinion, contrary to the prescription of Fed. R. App. P. 37, contained no instructions to the district court concerning the award of postjudgment interest. Consequently, Plaintiffs Bancamerica Commercial Corp. and ASARCO, Inc. moved that we reform the mandate to indicate interest should be awarded from the date of the district court's original judgment. We agree that interest should accrue on the entire judgment, including the forthcoming award of prejudgment interest, from August 2, 1995, the date of the district court's original judgment, and amend our mandate accordingly.

Postjudgment interest from the entry of the district court's judgment is mandatory. 28 U.S.C. § 1961(a) (1994). Rule 37 provides further guidance: "If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest." Failing to previously supply such instructions, we now repair our error.[*]

---

[*] The Advisory Committee Notes to Fed. R. App. P. 37 make it clear that recall and reformation of the mandate is appropriate to answer the question of postjudgment interest:

> Since the rule directs that the matter of interest be disposed of by the mandate, in cases where interest is simply overlooked, a party who conceives himself entitled to interest from a date other than the date of entry of judgment in accordance with the mandate should be entitled to seek recall of the mandate for determination of the question.

In determining whether postjudgment interest should accrue from the date of the district court's original judgment or the date of a later judgment, we examine "the extent to which the case was reversed." *Northern Natural Gas Co. v. Hegler*, 818 F.2d 730, 737 (10th Cir. 1987), *cert. dismissed*, 486 U.S. 1063 & 487 U.S. 1265 (1988).  Where the original judgment lacks an evidentiary or legal basis, postjudgment interest accrues from the date of the second trial court judgment, *see Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990); "where the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment." *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990); *see also, e.g., Dunn v. Hovic*, 13 F.3d 58 (3d Cir.) (awarding plaintiff postjudgment interest from date of original judgment even though original judgment was $26.3 million and ultimate judgment following appeal and remittiturs was $1.5 million), *cert. denied*, 510 U.S. 1031 (1993); *Coal Resources, Inc. v. Gulf & W. Indus.*, 954 F.2d 1263, 1273-75 (6th Cir. 1992) (awarding postjudgment interest from date of first judgment).

Here, our reversal was limited to the district court's failure to grant Plaintiffs prejudgment interest, whereas we affirmed all other aspects of the district court's lengthy  decision.  As in *Northern Natural Gas*, "reversal for such a purpose was not to a large 'extent' or an extent sufficient to change the

determinative judgment for . . . purposes [of the commencement of accrual of postjudgment interest]." 818 F.2d at 738. Accordingly, postjudgment interest should accrue from August 2, 1995, the date of the district court's original judgment.

Moreover, the monetary award upon which postjudgment interest should accrue is the entire award granted by the district court, including the forthcoming award of prejudgment interest. That is the dollar figure to which Plaintiffs justly became entitled on August 2, 1995, and failure to award Plaintiffs postjudgment interest on the prejudgment interest would wrongly decrease the present value of their monetary judgment. *See Northern Natural Gas*, 818 F.2d at 736-37 (approving award of postjudgment interest on accrued prejudgment interest).

Plaintiffs additionally filed a bill of costs pursuant to Fed. R. App. P. 39, seeking recovery of $1,455.64. Recovery of many of the itemized costs for which they seek to recover is not allowable under Rule 39. However, Plaintiffs' costs incurred in producing necessary copies of their second and fourth briefs on appeal, and their appendix, are allowable. The cost of eleven copies of their second brief (75 pages) at 7¢ per page totals $57.75, and the cost of eleven copies of their fourth brief (56 pages) at 7¢ per page totals $43.12. We also allow $388.00 for

the cost of producing five copies of their appendix,[**] reaching a grand total of $488.87.  Accordingly, we order costs of $488.87 to be taxed against Defendants Trinity Industries, Inc. and Mosher Steel Co.

**Entered for the Court:**

**WADE BRORBY**

---

[**]  This sum consists of five times the cost of 820 copies at 7¢ per copy, two oversize copies at 10¢ per copy, and 40 color copies at 50¢ per copy. (Although Plaintiffs list the actual cost of the color copies as 99¢ per copy, pursuant to 10th Cir. R. 39.1 the taxable cost of reproducing necessary copies will in no event exceed 50¢ per page, regardless of reproductive process.)

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

Filed 11/13/96

**TENTH CIRCUIT**

————————————

BANCAMERICA COMMERCIAL
CORPORATION, a Pennsylvania corporation;
ASARCO, INC.,

    Plaintiffs-Appellees-Cross-Appellants,      Nos. 95-3385 & 95-3396

v.

MOSHER STEEL OF KANSAS, INC., a
Kansas corporation; TRINITY INDUSTRIES,
INC., a Texas corporation,

    Defendants-Appellants-Cross-Appellees.

————————————

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 90-CV-2325-GTV)**

————————————

Elizabeth Drill Nay (Thomas M. Martin with her on the briefs) of Lewis, Rice &
Fingersh, L.C., Kansas City, Missouri, for Bancamerica Commercial Corporation.

Earl K. Madsen of Bradley, Campbell, Carney & Madsen, Golden, Colorado, for
Asarco, Incorporated.

Frederick W. Addison, III (Elizabeth E. Mack with him on the briefs) of Locke
Purnell Rain Harrell, Dallas, Texas, for Defendants-Appellants-Cross-Appellees.

————————————

Before **PORFILIO, TACHA** and **BRORBY**, Circuit Judges.

————————————

**BRORBY**, Circuit Judge.

_____

After a series of settlements and party realignments, Plaintiffs Bancamerica Commercial Corp. ("Bancamerica") and ASARCO, Inc. ("ASARCO") sued Defendants Trinity Industries, Inc. and a subsidiary, Mosher Steel Co., (collectively "Trinity") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 for contribution to costs the Plaintiffs incurred in an environmental cleanup of an industrial site. Additionally, Bancamerica asserted a pendant state law breach of contract claim. The district court held Trinity partially responsible for the site's environmental contamination, and ordered Trinity to reimburse Bancamerica and ASARCO for the $555,293.55 in expenses attributable to cleanup of Trinity's pollution. It also held Trinity liable to Bancamerica for $70,178.07 in unpaid taxes on Bancamerica's breach of contract claim. We reverse and remand the district court's refusal to grant Bancamerica and ASARCO prejudgment interest on the Comprehensive Environmental Response, Compensation, and Liability Act award, and affirm the remainder of the district court's opinion.

The district court's opinion, found at *Bancamerica Commercial Corp. v. Trinity Indus.*, 900 F. Supp. 1427 (D. Kan. 1995), contains a detailed description of

the facts; we provide only a synopsis. From 1899 to 1902 ASARCO operated what was at that time one of the world's largest lead smelters at the site. From 1907 to 1984 nonparties to this suit operated a steel fabrication facility on the site, using large amounts of lead-based paints and solvents. In 1984 Bancamerica obtained the site through a deed in lieu of forfeiture. Bancamerica immediately leased the site to Trinity, who occupied it until 1987. Trinity also used large amounts of lead-based paints and solvents on the site. ASARCO, the nonparties, and Trinity all contaminated the site to some extent. *Id.* at 1448-49.

Trinity and Bancamerica canceled the lease in 1987, at which time Trinity discontinued operations at the site. In conjunction with this cancellation, Bancamerica contracted to purchase certain cranes located on the site from Trinity for $200,000.00. Trinity claims Bancamerica has not yet paid this sum, and argues this alleged debt offsets the $70,178.07 it owes Bancamerica for unpaid taxes.

Upon entry on and investigation of the site, Bancamerica discovered a variety of contamination problems. Trinity left approximately 300 barrels on the site, some of which were leaking and/or contained hazardous substances. Trinity had buried approximately eighty of these barrels in a pit. Three underground

storage tanks were leaking gasoline into the soil. Most seriously, the site was highly contaminated with lead. The lead originated from three sources: slag and smelter ash (for which ASARCO was solely responsible), and lead-based paint (for which the nonparties and Trinity were responsible). *Id.* at 1449.

In 1989, the Environmental Protection Agency notified Bancamerica, ASARCO, and Trinity of their potential liability under the Comprehensive Environmental Response, Compensation, and Liability Act. In 1990, the Environmental Protection Agency and Bancamerica entered into an Administrative Consent Order that required Bancamerica to engage in a cleanup of the site. Thereafter, in 1991, the Environmental Protection Agency issued a Unilateral Comprehensive Environmental Response, Compensation, and Liability Act § 106 Order to ASARCO, requiring it to assist in the completion of the cleanup. Bancamerica and ASARCO, without assistance from Trinity, completed the cleanup. They then brought this suit seeking contribution from Trinity.

The parties raise seven issues on appeal. The first four, raised by Trinity, are: (1) whether the Environmental Protection Agency orders required Bancamerica and ASARCO to meet the public comment requirements of the national contingency plan; (2) if the district court should have decided whether

the cleanup was a "remedial" or a "removal" action; (3) whether Bancamerica was entitled to recover costs incurred in 1988 and 1989, prior to the Administrative Consent Order; and (4) whether Trinity was entitled to an offset against Bancamerica's claim for unpaid taxes. The issues raised by Bancamerica and ASARCO are: (5) whether Bancamerica and ASARCO were entitled to pre-judgment interest; (6) whether the district court erred in considering only toxicity and volume in allocating responsibility (and liability) for cleanup of the lead contamination; and (7) whether Trinity breached its lease with Bancamerica through improper maintenance or operation of the underground storage tanks. We reverse the district court's refusal to award Bancamerica and ASARCO pre-judgment interest, and affirm the district court on all other issues. We address these issues in the order presented to us.

I

Did the Environmental Protection Agency orders require Bancamerica and ASARCO to comply with the public comment requirements of the national contingency plan?

In order for Bancamerica and ASARCO to obtain contribution from Trinity, their response actions[3] must have been "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (1994).[4] Importantly, a regulation in the national contingency plan provides that "[a]ny response action carried out in compliance with the terms of an order issued by [the Environmental Protection Agency] pursuant to section 106 of [the Comprehensive Environmental Response, Compensation, and Liability Act] ... will be considered 'consistent with the [national contingency plan].'" 40 C.F.R. § 300.700(c)(3)(ii) (1995). Both of the orders under which Bancamerica and ASARCO acted were issued by the Environmental Protection Agency pursuant to § 106, and the district court found that Bancamerica and ASARCO complied with the terms of these orders. *Bancamerica*, 900 F. Supp. at 1451 n.2, 1452-53. Accordingly, the court held their response actions were consistent with the national contingency plan. *Id.* at 1453.

_____

[3] "Response actions" refer to cleanup actions taken in response to a release of hazardous substances into the environment. *See* 42 U.S.C. § 9601(23), (24), (25) (1994).

[4] The national contingency plan is a set of regulations promulgated by the Environmental Protection Agency that "establish[es] procedures and standards for responding to releases of hazardous substances, pollutants and contaminants." 42 U.S.C. § 9605; *see* 40 C.F.R. Part 300 (1995).

On appeal, Trinity contends Bancamerica and ASARCO failed to comply with all of the terms of their orders, and, therefore, the regulation's presumption of consistency with the national contingency plan is inapplicable. In particular, Trinity claims that language in the orders required Bancamerica and ASARCO to satisfy the national contingency plan's public comment requirements,[5] and that Bancamerica and ASARCO failed to do so. We review this issue de novo,[6] and finding Trinity's argument unconvincing, affirm the district court's holding.

Trinity relies on a provision in the Environmental Protection Agency order to Bancamerica that states "all actions required to be taken pursuant to the terms of this Order shall be undertaken in accordance with the requirements of all

---

[5] The national contingency plan requires private parties engaged in a cleanup to provide the general public an opportunity to comment on the selection of the response action. *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1514 (10th Cir. 1991); *see* 40 C.F.R. §§ 300.415(n), 300.430(f)(3) (1995).

[6] In *United States v. Colorado & E. R.R. Co.*, 50 F.3d 1530, 1538 (10th Cir. 1995), we reviewed the district court's finding that response costs were incurred consistent with the national contingency plan as a finding of fact entitled to the clearly erroneous standard. Here, we instead engage in de novo review because Trinity's argument raises questions of statutory interpretation, *see United States v. Diaz*, 989 F.2d 391, 392 (10th Cir. 1993) (statutory construction issues reviewed de novo), and contract interpretation, *see Reese Exploration, Inc. v. Williams Natural Gas Co.*, 983 F.2d 1514, 1518-19 (10th Cir. 1993) (interpretation of unambiguous contract terms reviewed de novo), rather than focusing on factual questions of the actions Bancamerica and ASARCO did or did not take.

applicable local, state, and Federal laws and regulations," and an analogous provision in the Environmental Protection Agency's order to ASARCO. Trinity contends these provisions required Bancamerica and ASARCO to comply with *all* the regulations of the national contingency plan (including the public comment requirements) to comply with the Environmental Protection Agency orders. That is, only by satisfying all the requirements of the national contingency plan could Bancamerica and ASARCO comply with the terms of their orders so as to obtain the regulation's presumption of acting "consistent with the national contingency plan."

We decline to accept this argument because, as the district court correctly noted, such an interpretation of the Environmental Protection Agency orders "would in effect render meaningless the regulation that deems actions taken in compliance with such orders to be consistent with the [national contingency plan]." *Id.* The fallacy of Trinity's argument is obvious. To obtain the regulation's presumption of consistency with the national contingency plan, Bancamerica and ASARCO would actually need to satisfy every requirement of the plan, thus eliminating any need for the presumption. Furthermore, in the order to Bancamerica, the Environmental Protection Agency expressly stated the work to be performed pursuant to the order, if properly performed, would be

-8-

"consistent with the provisions of the National Contingency Plan."  Thus, Trinity's interpretation of the "applicable law" provisions similarly would render meaningless this provision of the Environmental Protection Agency order.

Contrary to Trinity's allegations, our holding does not make meaningless the "applicable law" provisions.  Such provisions protect the Environmental Protection Agency from foreclosing additional enforcement options and ensure private persons engaged in a cleanup comply with applicable state and local laws and regulations.  Our holding does not impair the accomplishment of these goals.

The Environmental Protection Agency's comments on its regulations, which are entitled to substantial deference, *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991), further support our holding.  When drafting the 1990 national contingency plan,[7] the Environmental Protection Agency clearly contemplated that § 106 orders governing private persons engaged in response actions might not contain all of the "extensive technical and public

---

[7] The Environmental Protection Agency first promulgated the national contingency plan in 1982, reissued it in 1985, and then substantially revised it in 1990.  *Analytical Measurements, Inc. v. Keuffel & Esser Co.*, 843 F. Supp. 920, 932 (D.N.J. 1993).  The Environmental Protection Agency added the regulation at issue in 1990.  *See* 55 Fed. Reg. 8666 (1990).

participation requirements" of the plan. *See* 55 Fed. Reg. 8666, 8797 (1990). Nonetheless, the Environmental Protection Agency stated such orders contained the cleanup standards necessary for consistency with the national contingency plan, and therefore "defendants will have acted 'consistent with the [national contingency plan]' when they comply with a section 106 order." *Id.*

Accordingly, we find the correct reading of the "applicable law" provisions of the Environmental Protection Agency orders to Bancamerica and ASARCO to be that they refer to laws and regulations other than the national contingency plan, and did not require Bancamerica and ASARCO to meet the requirements of the national contingency plan. Therefore, we affirm the district court's holding that the orders did not require Bancamerica and ASARCO to comply with the national contingency plan's public comment requirements.

II

Was it necessary for the district court to decide whether the cleanup was a "removal" or a "remedial" action?

The Comprehensive Environmental Response, Compensation, and Liability Act contemplates two different types of environmental cleanups, referred to as

"removal actions" and "remedial actions."  *See* 42 U.S.C. § 9601(23), (24)

(defining removal and remedial actions).  "Generally speaking, a removal is a

short-term limited response to a more manageable problem, while a remedial

action involves a longer term, more permanent and expensive solution to a more

complex problem."  *Tri-County Business Campus Joint Venture v. Clow Corp.*,

792 F. Supp. 984, 991 (E.D. Pa. 1992).  The national contingency plan's

regulations governing "remedial actions" are much more stringent and demanding

than those governing "removal actions."  *Sherwin-Williams Co. v. City of*

*Hamtramck*, 840 F. Supp. 470, 475 (E.D. Mich. 1993); *Channel Master Satellite*

*Sys., Inc. v. JFD Elecs. Corp.*, 748 F. Supp. 373, 384 (E.D.N.C. 1990).  The

district court did not decide whether Bancamerica and ASARCO's response action

was properly characterized as a removal or a remedial action.  Trinity argues that

such an inquiry was a necessary threshold question prior to determining whether

the cleanup was "consistent with the national contingency plan."  Additionally,

Trinity asserts that Bancamerica and ASARCO's response action was a remedial

action,[8] and that the national contingency plan's rigorous regulations governing

remedial actions were incorporated into the Environmental Protection Agency's

---

[8] Trinity excepts Bancamerica's actions related to the barrels from this assertion.

-11-

orders through the "all applicable ... laws and regulations" provisions discussed above.  These arguments are simply variants of Trinity's first contention, and fail for the same reasons.

Because of the regulation presuming consistency with the national contingency plan for response actions performed according to the terms of an Environmental Protection Agency order, *see* 40 C.F.R. § 300.700(c)(3)(ii) (1995), whether Bancamerica and ASARCO's response actions are better characterized as removal or remedial is irrelevant.  In order for their response actions to be consistent with the national contingency plan, Bancamerica and ASARCO did not need to satisfy any of the plan's regulations governing *either* removal or remedial actions; they needed only to satisfy the duties and obligations set forth in the Environmental Protection Agency's orders.  Accordingly, a determination by the district court of whether the response action was a removal or a remedial action was unnecessary.

## III

Did the district court erroneously allow Bancamerica[9] to recover for response costs incurred in 1988 and 1989?

---

[9] This issue does not involve ASARCO because its response actions did not begin until 1991.

Trinity next contends, for a number of alternative reasons, the 1990[10] national contingency plan's presumption of consistency for response actions taken in compliance with Environmental Protection Agency orders, *see* 40 C.F.R. § 300.700(c)(3)(ii) (1995), does not apply to Bancamerica's actions taken in 1988 and 1989.  Bancamerica responds that because Trinity did not present this argument to the district court, we should not consider it on appeal.  *See Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 720 (10th Cir. 1993) (federal appellate courts do not consider issues not passed upon before the trial courts) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).  We agree with Bancamerica that this claim comes too late for our review.

Contrary to their assertion on appeal, at no time did Trinity raise this argument before the district court.  Indeed, Trinity fails to point to any place in the record where it argued the district court should consider Bancamerica's 1988 and 1989 response costs separately from the remainder of Bancamerica's costs. *See County Line*, 933 F.2d at 1515 (refusing to hear claim that preclosure investigatory costs were independently recoverable under Comprehensive

_____

[10]  Trinity argues in part that the 1985 version of the plan governed Bancamerica's 1988 and 1989 actions, and that that version did not contain a presumption of plan consistency.

-13-

Environmental Response, Compensation, and Liability Act regardless of inconsistency with the national contingency plan, where before, district court appellants had treated all response costs as a single allegation of injury). Rather, Trinity argued the entirety of Bancamerica's response was not consistent with the national contingency plan. Trinity's statement regarding where the distinct issue of Bancamerica's 1988 and 1989 actions was raised in the record cites merely to general references to the national contingency plan or to specific regulations in the 1990 plan.

"[V]ague, arguable references to [a] point in the district court proceedings do not ... preserve the issue on appeal." *Lyons*, 994 F.2d at 721 (quoting *Monarch Life Ins. Co. v. Elam*, 918 F.2d 201, 203 (D.C. Cir. 1990)). "[W]here a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial" or presents "a theory that was discussed in a vague and ambiguous way" the theory will not be considered on appeal. *Id.* at 722. Here, we question whether Trinity raised this argument before the district court in even a vague or ambiguous form. Furthermore, Trinity's new argument gives rise to a host of new issues, and Bancamerica had no opportunity to present evidence it may have thought relevant to these issues. Fear of such an unjust occurrence is

one of the primary rationales underlying the rule that appellate courts do not hear issues not previously raised. *See Singleton*, 428 U.S. at 120.

IV

Did the district court err in concluding that Trinity was not entitled to an offset against their breach of contract liability to Bancamerica?

The district court held Trinity liable to Bancamerica for failure to pay property taxes on the site, which Trinity was obligated to do under the lease. *Bancamerica*, 900 F. Supp. at 1480. Trinity argues it was entitled to offset its tax liability to Bancamerica against a greater sum of money that Bancamerica allegedly owed it under a different contract. The only evidence Trinity presented that Bancamerica had not paid the sum allegedly owed was a four page excerpt from the deposition of its vice-president. *Id.* Trinity had never provided Bancamerica with written notice of this claimed default, and the district court found Trinity failed to establish that Bancamerica had not fully paid the debt. *Id.* On appeal, Trinity has pled no evidence showing this finding of fact to be clearly erroneous. Accordingly, we affirm the district court's refusal to grant an offset.

V

Are Bancamerica and ASARCO entitled to prejudgment interest?

Bancamerica and ASARCO contend the district court erred in refusing to grant them prejudgment interest on the response costs for which it held Trinity liable. Indeed, they claim § 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a), mandates the award of such interest. Trinity responds that Bancamerica's and ASARCO's contribution action was pursuant to § 113(f), 42 U.S.C. § 9613(f) (1994), not § 107(a), *see Bancamerica*, 900 F. Supp. 1450, and that although § 107(a) provides for prejudgment interest, it does so only for actions proceeding under that section. *See* 42 U.S.C. § 9607(a)(4). Trinity further argues § 113(f) does not provide for the award of prejudgment interest, and so Bancamerica's and ASARCO's claim must fail.[11]

We review the issue of whether prejudgment interest may be granted in § 113(f) contribution actions de novo. *See United States v. Diaz*, 989 F.2d 391, 392 (10th Cir. 1993) (construction of federal statues reviewed de novo); *Driver*

_____

[11] Although this was not one of the reasons for which the district court refused to award Bancamerica and ASARCO prejudgment interest, *see Bancamerica*, 900 F. Supp. at 1469-70, Trinity correctly notes we may affirm the district court's holding for any reason supported by the record. *See United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994).

*Music Co. v. Commercial Union Ins. Cos.*, 94 F.3d 1428, 1433 (10th Cir. 1996)

(Although a "district court's award of prejudgment interest is generally subject to

an abuse of discretion standard .... [A]ny statutory interpretation or legal analysis

underlying such an award is reviewed de novo.").  We hold prejudgment interest

should be granted in § 113(f) actions in the same fashion as it is granted in § 107

actions.


In arriving at this holding, we must revisit the relationship between cost

recovery actions under § 107(a) and contribution actions under § 113(f).  Previous

opinions have laid much of the groundwork.  *See Colorado & E. R.R. Co.*, 50 F.3d

at 1534-36; *County Line*, 933 F.2d at 1515-17.  Pursuant to § 107, the

Comprehensive Environmental Response, Compensation, and Liability Act

generally imposes joint and several liability on persons deemed responsible for

the release or threatened release of hazardous substances.  *See, e.g., County Line*,

933 F.2d at 1515 & n.11.  When enacted in 1980,

> [The Comprehensive Environmental Response, Compensation, and
> Liability Act] made no express provision for contribution actions
> among parties held jointly and severally liable under its section 107
> liability scheme.  As a result, a potentially liable party under section
> 107 faced the prospect of being singled out as a defendant in a
> government or private cost recovery action without any apparent
> means of fairly apportioning [Comprehensive Environmental
> Response, Compensation, and Liability Act] costs awarded against it
> to other persons liable for these costs under the statute.  The courts
> responded to the inequity of this situation, and its negative

implications for encouraging private parties to undertake voluntary [Comprehensive Environmental Response, Compensation, and Liability Act] cleanups, by recognizing an implicit federal right to contribution under [the Comprehensive Environmental Response, Compensation, and Liability Act]. Congress ratified these efforts in 1986 by amending [the Comprehensive Environmental Response, Compensation, and Liability Act] section 113 to expressly recognize a right of contribution under the statute.

*Id.* at 1515-16 (citations omitted). We have since held an action between potentially liable persons such as Bancamerica, ASARCO and Trinity to apportion Comprehensive Environmental Response, Compensation, and Liability Act response costs between them is "the quintessential claim for contribution" and proceeds pursuant to § 113 rather than § 107, regardless of how pled. *Colorado & E. R.R.*, 50 F.3d at 1536, 1538; *see also Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934-35 (8th Cir. 1995); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994); *but see, e.g.*, *Laidlaw Waste Sys. Inc. v. Mallinckrodt, Inc.*, 925 F. Supp. 624, 629-31 (E.D. Mo. 1996) (allowing potentially liable private party to pursue Comprehensive Environmental Response, Compensation, and Liability Act cost recovery and contribution action under both §§ 107 and 113).

However, although such cost apportionment actions must be brought under the rubric of § 113(f), that section does not of itself create any new liabilities. Rather, it simply confirms the right of a person potentially jointly and severally

liable under § 107(a) to obtain contribution from other potentially liable persons. *See* H.R. Rep. No. 99-253(I), 99th Cong., 2d Sess. 79, *reprinted in* 1986 U.S. Code Cong. & Admin. News 2835, 2861 (citations omitted), *quoted in County Line*, 933 F.2d at 1517. It is no more than a "mechanism for apportioning [Comprehensive Environmental Response, Compensation, and Liability Act]-defined costs." *County Line*, 933 F.2d at 1517. Thus, of necessity it must incorporate the liabilities set forth in § 107(a), as those are the costs to be equitably apportioned. *See County Line*, 933 F.2d at 1516 ("[S]ection 107(a) must be the source for any right to contribution plaintiffs may have."); *Control Data*, 53 F.3d at 934-36 ("Recovery of response costs by a private party under [the Comprehensive Environmental Response, Compensation, and Liability Act] is a two-step process. Initially, a plaintiff must prove that the defendant is liable under [§ 107(a)]. Once that is accomplished, ... the question is what portion of the plaintiff's response costs will the defendant be responsible for [under § 113(f)]?" (Footnote omitted)); *Avnet, Inc. v. Allied Signal, Inc.*, 825 F. Supp. 1132, 1137 (D.R.I. 1992) ("Section 113(f) ... did not add a new cause of action, but ... only affirm[s] and make[s] clear an existing cause of action for contribution under Section 107".).

Understanding of this relationship and review of the statutory language of § 107(a) leads us to the inescapable conclusion that prejudgment interest must be awarded in § 113(f) cases just as it is in § 107(a) cases. Section 107(a) makes certain enumerated persons liable for:

> (A) all costs of removal or remedial action incurred by [government entities and]

> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4). It further states "[t]he amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D)." *Id.* Accordingly, the liability to be apportioned in a § 113(a) contribution action is that set forth in subparagraph (B) of § 107(a), which amount includes interest. Although § 107 apparently refers only to "actions under this section," because § 113(f) incorporates the liability provisions of § 107, in that sense a § 113(f) action for contribution *is* an action under § 107.

Our holding is consistent with logic, policy, and case law. The purpose of contribution is to equitably apportion response costs among liable parties. Failure to grant prejudgment interest on contribution awards may instead result in *inequitable* apportionment, because parties awarded contribution will still have lost the time value of the money they spent on behalf of other liable persons, and

those persons will have gained an equal amount. Further, refusal to grant prejudgment interest is a disincentive for private parties to voluntarily undertake cleanup actions because they will lose the time value of the money they spend on behalf of other persons. Indeed, it would create a perverse incentive for responsible parties to delay involvement in cleanups, because as they delay, they gain the time value of the funds they should be investing in the cleanup. Finally, other courts have awarded prejudgment interest in § 113(f) contribution actions, *see, e.g.*, *Browning-Ferris Indus. v. Ter Maat*, No. 92 C 20259, 1996 WL 67216, at *4-*5 (N.D. Ill. Feb. 16, 1996); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1132, 1140 (D. Ore. 1996), whereas we are aware of no cases holding § 107(a)'s authorization of prejudgment interest inapplicable to § 113(f) actions.

Our holding that § 113(f) incorporates the prejudgment interest provision of § 107(a) does not end discussion of whether Bancamerica and ASARCO are entitled to such interest. Section 107(a) states:

> interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of title 26.

42 U.S.C. § 9607(a)(4).

The district court, applying § 107, refused to grant Bancamerica and ASARCO prejudgment interest for two reasons. First, correctly noting that "prejudgment interest does not accrue until written demand for a specific dollar amount is made," it found Bancamerica and ASARCO had failed to make such a demand. *Bancamerica*, 900 F. Supp. at 1470. Second, the court held that even if Bancamerica and ASARCO had made the required demand, they were not entitled to prejudgment interest because they had not provided the court with the applicable interest rates or a method with which to compute the interest. *Id.* We review the district court's decision to withhold prejudgment interest for an abuse of discretion. *Driver Music*, 94 F.3d at 1433.

We hold the district court abused its discretion in finding Bancamerica and ASARCO failed to meet the demand requirement of § 107(a). On January 20, 1989, Bancamerica sent a letter to Trinity stating Bancamerica had incurred $45,818.31 for environmental work performed on the site, and that it believed Trinity to be responsible for these costs. The letter further requested that Trinity mail Bancamerica a check for $45,818.31. This letter is clearly a written demand for a specific dollar amount and therefore satisfies the statute.[12] ASARCO made

_____

[12] Trinity argues that the district court admitted this letter into evidence for the limited purpose of showing notice only, and thus Bancamerica cannot use it to show demand. This argument is meritless, because what the letter shows notice

demand on August 13, 1993, when Bancamerica and ASARCO filed their Third Amended Complaint. In this Complaint, ASARCO notified Trinity it had incurred response costs "in excess of $1 million," for which it was seeking reimbursement (plus interest from the date of expenditure). This demand of at least $1 million in response costs satisfies § 107(a)'s requirement of a written demand of a specific dollar amount. *See In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 908 (5th Cir. 1993).

We also hold the district court's refusal to grant Bancamerica and ASARCO prejudgment interest because they had not provided the court with interest rates or a method with which to compute the appropriate interest was an abuse of its discretion. Such a requirement is stated nowhere in the statute. Rather, § 107(a) speaks in mandatory terms: "The amounts recoverable ... *shall* include interest." 42 U.S.C. § 9607(a)(4). Furthermore, the statute itself provides the applicable interest rates, stating the interest rate shall be the same as that for Superfund investments. *Id.* The rates for 1989 through 1993 were identified in *Hatco Corp. v. W.R. Grace & Co.--Conn.*, 836 F. Supp. 1049, 1090 (D.N.J. 1993), a case that Bancamerica and ASARCO cited to the District Court in their Post-Trial Brief,

---

of is that Bancamerica made demand upon Trinity for a specified dollar amount.

and in any event were available to the district court from the Department of the Treasury or the Environmental Protection Agency. *See id*. The prejudgment interest should be calculated using generally accepted accounting principles.

We do agree with the district court that it is appropriate to require those requesting prejudgment interest to provide the court with proper calculations setting forth the interest they seek. However, we also agree with Bancamerica and ASARCO that, because interest determinations are compounded calculations, it may be impossible for parties to provide accurate calculations prior to the court's allocation of response cost liability. In such instances, parties may submit their interest calculations to the court subsequent to that finding. *See United States v. Hardage*, 750 F. Supp. 1460, 1495-96 (W.D. Okla. 1990), *aff'd*, 982 F.2d 1436 (10th Cir. 1992), *cert. denied,* 510 U.S. 913 (1993); *United States v. Northernaire Plating Co.*, 685 F. Supp. 1410, 1421 (W.D. Mich. 1988), *aff'd,* 889 F.2d 1497 (6th Cir. 1989), *cert. denied*, 494 U.S. 1057 (1990).

Accordingly, we hold Bancamerica and ASARCO are entitled to prejudgment interest on the response costs awarded them, accruing from the later of the dates Bancamerica and ASARCO made their respective demands upon Trinity or the date of the expenditure concerned. *See* 42 U.S.C. § 9607(a)(4). We

-24-

remand to the district court for determination of the appropriate amount of such interest.

VI

Did the district court err in considering only toxicity and volume in allocating liability for the site's lead contamination?

In deciding contribution claims, a district court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Here, the district court considered "the approximate volume of total lead at the Site contributed by [Trinity], and the degree of toxicity of the lead," and held Trinity responsible for five percent of the total response costs related to lead contamination. *Bancamerica*, 900 F. Supp. at 1473-74. Bancamerica and ASARCO argue the district court should have considered additional factors in calculating the allocation of lead response costs, and accordingly increased Trinity's allocation.

The district court has "considerable discretion in apportioning equitable shares of response costs." *FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 846 (10th Cir. 1993). We reverse only upon an abuse of that discretion. *See id*. at

847; *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 573 (6th Cir. 1991). This holds particularly true in a complex case such as this one, wherein the district court engaged in extensive fact-finding during a trial lasting more than seventeen days.

Although courts have looked to a number of factors in making such allocations, *see, e.g.*, *Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508-09 (7th Cir. 1992) (listing possible considerations), the Comprehensive Environmental Response, Compensation, and Liability Act states the court need only consider those equitable factors it deems appropriate. 42 U.S.C. § 9613(f)(1). Indeed, we have stated "a court may consider several factors, a few factors, or only one determining factor, ... depending on the totality of the circumstances presented to the court." *Colorado & E. R.R Co.*, 50 F.3d at 1536 (quoting *Environmental Transp. Sys., Inc*., 969 F.2d at 509). The clause "depending on the totality of the circumstances" does not, as Bancamerica and ASARCO argue, mandate that the district court weigh all possibly relevant factors. It is simply a statement of the self-evident proposition that the circum-stances of the contamination and the cleanup will drive the district court's determination of what equitable factors are appropriate to consider. After review of both the record and the district court's fifty-six-page (excluding headnotes)

opinion, we cannot say the district court abused its discretion in considering only the two factors noted above.[13]

VII

Did the district court err in failing to award Bancamerica damages on its breach of contract claim regarding the underground storage tanks?

Bancamerica's final contention on appeal is that Trinity breached its lease contract with Bancamerica by operating leaking underground storage tanks and failing to repair them. The tanks leaked gasoline into the surrounding earth, necessitating removal of the contaminated soil. We review the district court's finding that no breach of contract existed under the clearly erroneous standard. *Production Credit Ass'n v. Alamo Ranch Co.*, 989 F.2d 413, 419 (10th Cir. 1993); *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289 (10th Cir. 1988).

---

[13] It is noteworthy that some of the factors Bancamerica and ASARCO contend the district court should have considered were in fact subsumed into the two factors the district court explicitly contemplated. For example, although the district court refused to expressly consider the greater bioavailability of lead from paint versus lead from slag and smelter ash, such a consideration was inherent in the court's weighing of the greater toxicity of lead from paint.

The tanks were present on the site when Trinity entered its lease with Bancamerica, and the district court found Trinity used only one of the three tanks, and it only for a short time at the inception of the lease. *Bancamerica*, 900 F. Supp. at 1478. The court further found Bancamerica failed to establish that Trinity improperly operated or maintained the tanks, or even that the soil contamination occurred during the period of Trinity's lease. *Id.* The leakage could have occurred prior to Trinity's occupation of the site, or during the year between when Trinity left the site and when Bancamerica discovered the leaking gasoline. Indeed, some leakage occurred during removal of the "rusted and pitted" tanks. On appeal, Bancamerica has failed to produce evidence showing the district court's holding to be clearly erroneous, and we accordingly affirm.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further consideration consistent with this opinion.