**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 26 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PUBLIC SERVICE COMPANY OF
COLORADO, a Colorado corporation,

      Plaintiff-Appellant,

v.

GATES RUBBER COMPANY, a
Colorado corporation; GATES ENERGY
PRODUCTS, INC., a Colorado
corporation; THE GATES
CORPORATION, a Delaware
corporation; THE DENVER AND RIO
GRANDE WESTERN RAILROAD
COMPANY, a Delaware corporation,

      Defendants-Appellees.

No. 98-1015

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 96-N-1922)**

---

Kathryn A. Elzi, Koncilja & Associates, P.C., Denver, Colorado, for Plaintiff-Appellant.

Roger L. Freeman and Dean C. Miller on the brief, Davis, Graham & Stubbs, LLP,
Denver, Colorado, for Defendant-Appellee The Denver and Rio Grande Western Railroad
Company.

Thomas C. Reeve (Linda J. Swanson and Kathleen E. Craigmile, with him on the brief),
Bennington Johnson & Reeve, P.C., Denver, Colorado, for Defendants-Appellees The
Gates Corporation, d/b/a The Gates Rubber Company and Gates Energy Products, Inc.

Kathleen M. Snead, Denver, Colorado, on the brief for Defendant-Appellee The Denver and Rio Grande Western Railroad Company.

---

Before **PORFILIO**, **MCKAY** and **BRISCOE**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

After cleaning up a site contaminated by hazardous substances, Public Service Company of Colorado (PSCO) filed suit under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 - 9675, to hold the Gates Rubber Company and the Denver and Rio Grande Western Railroad Company (Defendants) jointly and severally liable and for contribution to its response costs. However, finding PSCO's cleanup was not consistent with the National Contingency Plan (NCP), the district court granted summary judgment for Defendants. ***Public Service Co. of Colo. v. Gates Rubber Co.***, 22 F. Supp.2d 1180 (D. Colo. 1997). In this appeal, PSCO contends the court erred in failing to recognize that the state of Colorado's extensive involvement in its cleanup of the site was tantamount to compliance with the NCP. Although the proposition may be sustainable under certain circumstances, the facts here permit no such conclusion. We therefore affirm.

**I.**

From the 1940's through the 1980's, the Barter Machinery and Metals Company (Barter), a metal salvaging business, bought scrap iron and copper, electrical equipment, transformers,[1] and old batteries from PSCO and some other companies. Barter was located just northeast of the intersection of South Santa Fe Drive and West Bayaud Avenue in Denver, Colorado, and was comprised of five parcels of land: 100 South Santa Fe Drive (Lot A); 101 South Santa Fe Drive (Lot B); 701 West Bayaud Avenue (Lot C); 60 Inca Street (Lot D); and 60-68 Inca Street (Lot E) (collectively, the Site). In 1990, the Environmental Protection Agency (EPA) placed Lot C, the largest of the parcels comprising Barter, on the Superfund Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS), an inventory of sites targeted for EPA planning and tracking. Barter then hired an environmental consulting company which performed limited soil sampling and analyzed the heavy metals content of oil and iron stained areas and sludge in a drain pit. This initial investigation confirmed the presence of PCBs and lead contamination in the limited areas tested. Recognizing its potential liability for cleaning up the contamination,[2] PSCO agreed to share Barter's costs

---

[1]The junk transformers sold to Barter for salvage contained PCB oil which leaked and eventually contaminated the soil and groundwater. Scrap metal and lead-acid batteries deposited lead into the soil.

[2]In an interoffice memo, PSCO's Environmental Services Manager wrote, "PSCO
(continued...)

for a more comprehensive investigation of the site.  In 1992, PSCO and Barter negotiated PSCO's cleaning up the Site in exchange for title to the property.  It then planned to sell the Site to recoup its cleanup expenses.  As contamination surfaced on additional lots, PSCO included those lots in the cleanup.

In that effort, PSCO retained ERM-Rocky Mountain, Inc. (ERM) which evaluated the soil and ground water conditions of Lots A, C, and D and found elevated levels of heavy metals including lead in high concentrations and polychlorinated biphenyls (PCBs) exceeding Colorado Basic Ground Water and federal hazardous waste standards.  The ERM study was followed by a "Proposal for Remedial Action," dated November 6, 1992, submitted by United States Pollution Control, Inc. (USPCI), which PSCO retained to clean up Barter.  In that proposal, USPCI set its objective "to remediate the areas within the site known to contain PCB contamination ..., mixed PCB/lead contamination (as yet undefined), and lead contaminated areas (as yet undefined)."  USPCI proposed "[r]emediation will consist of decontamination or removal of large surface debris, followed by the removal, treatment, and disposal of contaminated soil."  USPCI's cleanup began on November 30, 1992, and included constructing a fence and gate around the

---

[2](...continued)
is 'on the hook' as a PRP [potentially responsible party under CERCLA] with over 25 years of selling scrap transformers to Barter Machinery and Supply Company well documented (over 1,200 transformers from 1986 alone, plus hundreds of tons of scrap metal)."

property.[3]  On the fence, PSCO posted English-only signs reading "Any Questions about Site Activities, please call 294-8488."  USPCI proceeded to excavate soil, pocking the area with piles of potentially contaminated soil which it planned to decontaminate on site by feeding the excavated material into a pug mill.  Once the "stabilized material" was "staged in discrete piles," USPCI proposed to transport the substance to a "selected disposal facility."  However, the piles alerted the Colorado Department of Health (CDH) to the cleanup.[4]

On March 5, 1993, Walter Avramenko, a Corrective Action Unit Leader at CDH, wrote PSCO acknowledging the work plan to stabilize lead contaminated soil on site; requesting further testing and information; and questioning the facility where PSCO planned to transport the materials.  Although agreeing with PSCO's initial goals and methods, Mr. Avramenko told PSCO "to modify the plan to address the concerns and recommended changes," and noted the anticipated consent agreement between the parties would address additional matters.

On April 22, 1993, PSCO responded to CDH, acknowledging "the regulatory driven concerns behind CDH's inquiry," as balanced against its own need to remove the

[3]It is not clear whether the fence was constructed to keep vandals out or to protect the surrounding neighborhoods.

[4]A "Weekly Report," made before the piles were discovered, indicated CDH, EPA, and OSHA personnel would be informed of the Site project and might visit.  In a letter to CDH, Harry Moseley, PSCO's Environmental Programs Unit Manager, stated PSCO had notified CDH on December 8, 1992, of the "removal action of polychlorinated biphenyls (PCBs) and lead contaminated soil and debris."

contamination in a cost effective manner for its rate payers "while ensuring protection of human health and the environment." It dubbed its proposed solution a "'win-win' situation for all." However, on May 26, 1993, Frederick Dowsett, CDH's Chief of Monitoring and Enforcement of Hazardous Material, responded, enumerating CDH's "serious concerns" about the cleanup plan and urging PSCO to enter into a Compliance Order on Consent "to resolve the regulatory issues" related to investigation, management, and remediation of the Barter Site. The resulting Order on Consent, signed on September 20, 1993, catalogued the work CDH expected PSCO to perform, particularly to ensure the proper management of waste stockpiles and to continue soil and water sampling to track levels of contamination. CDH ordered PSCO to submit monthly progress reports and a final report documenting all soil removal activities. Eventually, PSCO completed the cleanup in early 1996.

In June 1993, PSCO notified Defendants of their potential liability for a proportionate share of the $9 million expended to clean up the Site. When Defendants balked, PSCO filed the underlying action seeking cost-recovery under CERCLA, 42 U.S.C. § 9607(a); CERCLA contribution, 42 U.S.C. § 9613(f); a declaratory judgment Defendants are liable for any future necessary response costs consistent with the NCP, 28 U.S.C. § 2201, 42 U.S.C. § 9613(g)(2); and recovery under state law for nuisance and joint and several liability under the Uniform Contribution Among Tortfeasors Act (UCTA).

On cross motions for summary judgment, the district court held as a matter of law PSCO's cleanup was a remedial action which did not substantially comply with the NCP. 22 F. Supp.2d at 1194. With that conclusion, the court disposed of all of PSCO's CERCLA-related claims and refused to exercise supplemental jurisdiction over the state law claims.

Because the record before the district court was fully developed, it was appropriate for it to decide whether PSCO met its prima facie burden of establishing NCP consistency. *County Line, Inv. v. Tinney*, 933 F.2d 1508, 1517-18 (10th Cir. 1991).[5] We review that determination *de novo* applying our summary judgment jurisprudence to view the entire record through PSCO's lens, drawing all reasonable factual inferences in its favor to assure there is "no genuine issue as to any material fact" meriting trial. Fed. R. Civ. P. 56(c).

---

[5]To state a cause of action under § 9607(a), a plaintiff must allege (1) defendant is a "covered person" within the meaning of CERCLA; (2) a "release" or "threatened release" of any "hazardous substance" from the site in question has occurred; (3) the release or threatened release caused plaintiff to incur costs; (4) plaintiff's costs are "necessary" costs of response; and (5) plaintiff's response action or cleanup was consistent with the NCP. *Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp.*, 748 F. Supp. 373, 381 (E.D. N.C. 1990). Consistency with the NCP is not only an essential element of proof under § 9607(a) but also becomes the lynchpin for § 9613(f) contribution.

## II.

In 1980, Congress enacted CERCLA, 42 U.S.C. §§ 9601-9675, in the wake of the Love Canal disaster, "to establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R. Rep. No. 96-1016, pt. I, at 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6125. In 1986, Congress amended CERCLA, passing the Superfund Amendments and Reauthorization Act (SARA) to fortify its broad, remedial purpose "to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." **OHM Remediation Services v. Evans Cooperage Co.,** 116 F.3d 1574, 1578 (5th Cir. 1997).

CERCLA's cost-shifting scheme is found in § 107(a), 42 U.S.C. § 9607(a), which imposes strict liability on four classes of "potentially responsible parties. (PRPs)."[6] **United States v. Colorado & Eastern R. Co.**, 50 F.3d 1530, 1535 (10th Cir. 1995). Section 9607(a) provides, in part:

> (4) any person who accepts or accepted any hazardous substances ... shall
> be liable for–
>      ....

---

[6]The categories of PRPs broadly include current and former owners and operators of a facility or vessel involved in hazardous substance disposal and persons who arranged for or accepted hazardous substances for disposal or transportation. 42 U.S.C. § 9607(a)(1)-(4).

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

To facilitate the cost-shifting to all PRPs, Congress added § 113(f)(1) under SARA to provide, "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of [CERCLA]" for its costs of recovery. The present action sought to impose joint and several liability on Defendants under § 9607(a)(4)(B) for allegedly arranging for the disposal of hazardous substances at Barter and to require them to contribute to PSCO's response costs. Both claims require compliance with the NCP. *Bancamerica Commercial v. Mosher Steel of Kan.*, 100 F.3d 792, 796 (10th Cir. 1996).

The NCP is EPA's regulatory template for a "CERCLA quality cleanup." *County Line*, 933 F.2d at 1514 (citation omitted). It "sets performance standards, identifies methods for investigating the environmental impact of a release or threatened release, and establishes criteria for determining the appropriate extent of response activities." *OHM Remediation*, 116 F.3d at 1579; 40 C.F.R. pt. 300. The regulations provide: "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section and results in a CERCLA-quality clean-up ...." 40 C.F.R. § 300.700(c)(3)(I).

NCP requirements vary depending on whether the response action is characterized as a removal or a remedial action. Generally, a removal action costs less, takes less time,

and is geared to address an immediate release or threat of release.[7] ***Bancamerica Commercial***, 100 F.3d at 797; ***County Line***, 933 F.2d at 1512 n.6; ***Public Service***, 22 F. Supp.2d at 1187; 42 U.S.C. § 9601(23). In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer. ***Bancamerica Commercial***, 100 F.3d at 797; 42 U.S.C. § 9601(24). Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed. ***General Electric Co. v. Litton Industrial Automation Systems, Inc.***, 920 F.2d 1415, 1419 (8th Cir. 1990) ("Any distinction between 'excavation' of contaminated soil and 'removal' of contaminated soils is one that eludes us.").

Finally, it bears emphasizing the EPA has expressly resolved a conflict in the circuits under the earlier NCPs over whether the regulations require strict or substantial compliance with the NCP for a response action to be deemed consistent. Section 300.700(c)(3)(I) defines "consistent with the NCP" to require substantial compliance upon evaluating the cleanup as a whole, and "immaterial or insubstantial deviations" from the provisions of 40 C.F.R. part 300 "will not be considered not consistent with the NCP." 40 C.F.R. § 300.700(c)(4). Response costs incurred under the 1990 NCP, like those here, are subject to review under the substantial compliance standard. Thus,

---

[7]It is instructive that under 42 U.S.C. § 9604(c)(1) a removal action must be capable of being completed within one year and cost no more than $2 million.

although the regulations do not expressly define "consistent," we believe those response actions reflecting in substance NCP procedures and criteria will be deemed consistent.

Under § 300.700 of the regulations, a response action will be "consistent with the NCP" if the private party substantially fulfills requirements for (1) worker health and safety; (2) documentation of cost recovery; (3) permit requirements; (4) identification of applicable or relevant and appropriate requirements (ARARs);[8] (5) remedial site evaluation; (6) remedial investigation/feasibility study and selection of remedy (RI/FS),[9] and (7) providing "an opportunity for public comment concerning the selection of the response action" which might include preparing a formal community relations plan, ensuring opportunities for public involvement, and disseminating information to the community. Although the regulations are less complex and comprehensive for removal actions to reflect the EPA's interest in facilitating a private party's swift response to a threatened release, the NCP's regulatory framework remains EPA's main leverage in

---

[8]Section 300.400(g)(2) sets forth considerations for responding to a hazardous release in an appropriate and relevant manner by looking to whether "a requirement addresses problems or situations sufficiently similar to the circumstances of the release or remedial action contemplated." These include the medium or substance regulated or affected at the CERCLA site; the activities regulated; whether there are any variances, waivers, or exemption at the CERCLA site; the type and size of the place regulated; and whether use or potential use of affected resources are contemplated. Only state standards that are more stringent than federal requirements may be considered in setting the ARARs for a particular site. § 300.700(g)(2) and (3).

[9]The RI/FS requirements found in 40 C.F.R. § 300.430 reflect a program goal "to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste." § 300.430(a)(1)(i).

assuring the quality and consistency of private party response actions when surrounding communities and the environment are put at risk. *Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp.*, 748 F. Supp. 373, 394 (E.D. N.C. 1990).

In addition, Section 9607(a) provides two distinct burdens in establishing consistency with the NCP. Under subsection (A), the United States government, a State, or an Indian tribe may recover "all costs not inconsistent with the national contingency plan;" while a private party must prove its response action is consistent with the NCP. *Washington State Dept. of Transp. v. Natural Gas Co.*, 59 F.3d 793, 799-800 (9th Cir. 1995). In this appeal, PSCO seeks to bootstrap itself to the state's presumption of consistency with the NCP.

## III.

PSCO contends its cleanup, geared to the less stringent requirements of a removal action although, in effect, equally appropriate for a remedial action, was generated by CDH's Consent Order and should be *presumed* to be consistent with the NCP. As a generic proposition, the contention has precedent, *Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir. 1998); however, under the facts of this case, it rings hollow.

First, to determine which NCP regulations apply, PSCO urges the district court erroneously concluded the Barter cleanup was a remedial action by focusing exclusively on the permanent nature of the remedy and ignoring the actual chronology of the cleanup.

- 12 -

That is, PSCO insists although its initial response action "was planned to last eleven weeks," the unexpected discovery of lead contamination injecting CDH into the process caused "the total response action" to last only thirty months. Thus, it maintains its cleanup was not protracted as the district court found. Moreover, contrary to the district court's perception that excavating and transporting hazardous materials from a site constitutes a permanent remedy, it contends the case law is replete with similar factual settings found to be removal actions, and CERCLA's own definition of a removal action supports its position.

PSCO relies principally on *General Electric,* 920 F.2d at 1415, which, it maintains, involved similar facts although the Eighth Circuit deemed the response a removal action. In that case, GE commenced a cleanup of cyanide-based electroplating wastes, sludge, and other pollutants on a site GE purchased from Litton Industries. In 1986, GE negotiated a consent decree with the Missouri Department of Natural Resources which expressly required any cleanup action to be consistent with the NCP. A site investigation produced several remedies, the most expensive of which, excavation of contaminated soil and drums containing highly contaminated substances, was implemented. In 1988, the state declared the site had been properly cleaned. GE spent approximately $84,000 in the RI/FS phase and $851,000 in actual cleanup of the site which took two years.

PSCO declares the case a Cinderella fit by creating a bright line in its appellate stance between its initial PCB investigation and cleanup and its lead cleanup, which it characterizes as a separable and subsequent undertaking.[10]  For PSCO's rendition, CDH became involved when it discovered the piles of lead contaminated soil after PSCO had dealt with the PCB wastes.  Thus, the Consent Order, which was the blueprint for the lead cleanup, was spawned solely by the lead contamination.  Indeed, PSCO seeks contribution from Defendants only for its lead cleanup.  Because the cleanup began after September 20, 1993, the date of the Consent Order, and targeted removal of the piles of lead contaminated soil, which it promptly performed over the next thirty months, the action is properly deemed one for removal, PSCO reasons.

The record belies this version.  In 1989, Barter, concerned about EPA's interest in the Site, retained ATEC Environmental Consultants (ATEC) to do a preliminary environmental assessment.  ATEC's report noted the presence of PCBs and identified high levels of lead in some of the soil it sampled.  Subsequently, PSCO undertook its own investigation and cleanup and, as noted, retained USPCI to develop and implement a remedial plan in 1992, well before the state's involvement.  USPCI's report, entitled "Proposal for Remedial Action," specifically addresses lead contaminated soil removal

---

[10]Defendants contend PSCO raises this argument for the first time on appeal, which is confirmed by the record.  Following our jurisprudential practice, we do not consider it on appeal.  *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir. 1998).

with on-site stabilization and rail transportation.  Although a removal action involves a prompt response to a release or threatened release of hazardous substances, PSCO studied the site from at least 1991 when it and Barter entered into an environmental agreement until 1992 when ERM filed a second preliminary assessment.  By its own assertion, PSCO expended approximately $9 million and did not complete the cleanup until 1996, at least four years after it began.  PSCO intended to remediate the Site to sell it and recoup its cleanup costs.  That is, PSCO intended to effect a permanent remedy.  Although PSCO "removed" and "excavated" soils and buried storage drums, neither of those acts alone nor their particular labeling transforms the cleanup into a removal action.  The district court did not err in concluding PSCO undertook a remedial action which triggered the more detailed requirements of the NCP.  *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998).

However, even under the district court's purported misapprehension of the nature of the response performed,  PSCO contends its CDH-mandated cleanup must be deemed consistent with the NCP because of the state's "intensive involvement and comprehensive oversight in the cleanup."  It urges in effect the district court erroneously applied a strict compliance standard and "hypertechnical analysis," rejecting its initial investigation, site evaluation, and proposed remedy selection because the documents did not bear the precise labels the NCP requires.  More egregiously, it contends the district court devalued

PSCO's effort to involve the surrounding community when, in fact, "the CDH *did* function as *parens patriae."*

Again neither the record nor precedent supports this version. The record establishes although CDH disapproved of some of the techniques USPCI was using to neutralize contaminated soils and required PSCO to ship its contaminated substances to a different facility, CDH was never involved in assessing the Site, proposing alternative remedies, overseeing the remedy, or involving the surrounding community. In a May 26, 1993 letter from CDH to PSCO, CDH documented its "serious concerns" about "PSCO's activities at the Barter facility," including placement of hazardous waste into piles with the attendant possibility of spreading the contamination through wind blown dispersion; possibly inadequate sampling methods being utilized; the proposed use of a pug mill to treat contaminated soils; and its need of "additional information to evaluate the adequacy of investigation." The record contains no sequence of documentation of the cleanup that occurred once the Consent Order was signed. Indeed, CDH was not PSCO's alter ego in the cleanup. Rather, the record discloses CDH was concerned with compliance with state requirements which do not fully mirror those of the NCP.[11]

_____

[11]Contrary to PSCO's argument, our analysis does not afford federal consent decrees the presumption of consistency while denying that presumption to state consent decrees. Further, ***Arizona v. Components Inc.***, 66 F.3d 213, 216 (9th Cir. 1995), upon which it relies, is wholly inapposite.

***Washington State Dept. of Transp.,*** 59 F.3d at 793 (***WSDOT***), is instructive. In that case, the Ninth Circuit held ***WSDOT*** was a "state" under § 9607(a)(4)(A) for purposes of affording a presumption of consistency to its cleanup of hazardous waste. However, the court proceeded to conclude ***WSDOT***'s cleanup was not consistent with the NCP. Although ***WSDOT***'s lead representative was not even aware of the NCP and its consultant did not refer to the NCP, the Ninth Circuit offered that "an environmental cleanup could conceivably follow a standard procedure consistent with the NCP, even if the NCP is not actually referenced." ***Id.*** at 803. From that stance, the court proceeded to view ***WSDOT***'s actions under the NCP standards to decide whether they, in fact, though not in name, comported with the regulations. At each stage, the court found the cleanup failed to achieve even *pro forma* conformity. The remedial investigation "failed to determine the nature or extent of the threat posed by the tar-like material," ***id.***; the development and screening of cleanup remedies failed to account for all hazardous substances and testing results; and ***WSDOT*** "failed to provide an opportunity for public review and comment of the alternative remedial measure it was considering." ***Id.*** at 805. Because of this "high degree of inconsistency," the court concluded ***WSDOT*** was not entitled to recover its response costs under § 9607. ***Id.***

Similarly, the record here discloses PSCO undertook the Barter cleanup without reference to the NCP. PSCO's predominating remedial concern was financial, to create a "win-win" position for itself and its ratepayers and to defuse or minimize any public

scrutiny of the effort.[12]  CDH's initial concern focused on the remedy PSCO selected, creating piles of contaminated matter for on-site disposal using a technique that was potentially harmful to the surrounding community.  However, the Consent Order addressed matters fundamental to the preliminary remedial investigation and determination of the nature and extent of the threat presented.  Neither PSCO nor CDH developed alternative courses of action touching on "project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives."  40 C.F.R. § 300.430(a)(2).

Further, the Consent Order was silent on any requirement to inform the public about the Site and its cleanup.[13]  In that absence and for its part, PSCO did nothing to fulfill the NCP's community relations obligations.  40 C.F.R. § 300.430(c).  Indeed, PSCO's only effort to involve the public was to place signs in English on the fence erected to contain the Site.  The signs read "Any Question About Site Activities, please

---

[12]After the Rocky Mountain News printed an article about the Barter Site, PSCO's public relations department sought to keep a low profile.  In a deposition, its representative stated, "Public Service Company likes to have its customers view it as an environmentally conscious company.  The public has a certain perception about PCBs as contaminants, and those issues don't always get put in the proper context."

[13]This absence cannot be filled by PSCO's invoking the doctrine of *parens patriae*, equating the State's involvement with substantial compliance with the NCP.  Although the 1990 NCP suggests that "significant state involvement serves the identical purpose that the public notice provision seeks to effectuate," **Bedford Affiliates v. Sills**, 156 F.3d 416, 428 (2d Cir. 1998), the facts before us do not permit us to equate CDH's executing the Consent Order as the equivalent of active state involvement.  In **Bedford**, the New York Department of Environmental Conservation, state officials were actively involved in the cleanup, "present to investigate the implementation of the preliminary site assessment and the interim remedial measure, and generally to oversee the progress of the cleanup." **Id.** at 428.

call 294-8488." This effort to inform the predominantly Hispanic community neighboring the Site or solicit their comments wants substance.[14]

"Where a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement." *Bedford Affiliates*, 156 F.3d at 428. Other than its argument, PSCO can direct us to no record evidence of the state's comprehensive involvement in its cleanup. Indeed, stripped of argument, the facts closely track those in *County Line Inv.*, 933 F.2d at 1512-14.

Thus, PSCO has failed to set forth any facts permitting us to find a triable issue on the consistency of its cleanup with the NCP. We therefore **AFFIRM** the district court's order granting Defendants summary judgment.

---

[14]PSCO conceded that although several people in the area approached workers on the Site with questions about the activity, there was no effort to provide information.