**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 17 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

EMPLOYERS REINSURANCE
CORPORATION,

      Plaintiff - Counter-Claim
Defendant - Appellant/
Cross-Appellee,

v.

MID-CONTINENT CASUALTY
COMPANY,

      Defendant - Counter-
Claimant - Appellee/
Cross-Appellant.

Nos. 02-3274 and 02-3291

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 01-CV-2058-KHV)

---

Douglas R. Richmond (Patrick J. Kenny and Carlton D. Callenbach, with him on
the briefs), of Armstrong Teasdale LLP, Kansas City, Missouri, for Plaintiff -
Counter-Claim Defendant - Appellant/Cross-Appellee.

Vincent F. O'Flaherty (Julie J. Gibson and Michael L. Belancio, with him on the
briefs), of Niewald, Waldeck & Brown, Kansas City, Missouri, for Defendant -
Counter-Claimant - Appellee/Cross-Appellant.

---

Before **HARTZ** , **HOLLOWAY** , and **McKAY** , Circuit Judges.

---

**HARTZ**, Circuit Judge.

_____

The parties to this appeal are two insurance companies. Employers Reinsurance Corp. (ERC) and Mid-Continent Casualty Co. (MCCC), a property and casualty insurance company, entered into a Liability Excess Reinsurance Agreement (the Agreement). Under the Agreement ERC reinsured MCCC with respect to certain payments and expenses for which MCCC was responsible to its insureds under policies it issued. In addition, ERC insured MCCC for some extra-contractual liabilities it might incur to its insureds—such as liability for bad faith denial of a claim. Of particular concern on appeal, if MCCC had to pay a "loss" exceeding $300,000, ERC would reimburse MCCC for the excess of the loss above $300,000, up to a maximum loss of $1,000,000. (We will refer to the $300,000 threshold as MCCC's "retention," which is similar to a deductible in ordinary insurance policies.) Additionally, the Agreement required ERC to pay a share of "claim expenses" incurred by MCCC if the retention was exceeded.

The amounts disputed in this case arise out of declaratory judgment actions between MCCC and its insureds. In several such actions it was determined that MCCC should have provided its insured with a defense to a tort action brought by a third party against the insured. As a result, (1) MCCC had to pay its insureds the attorney fees and expenses incurred by the insureds in the declaratory

judgment actions; (2) MCCC paid its own attorney fees and expenses in the declaratory judgment actions; and (3) MCCC had to pay the attorney fees incurred by the insureds in defending the underlying tort actions. This appeal centers on whether these payments and expenses were covered by the Agreement as "losses," "claim expenses," or neither.

Regarding the first type of payment, MCCC contends that the Agreement's definition of "loss" unambiguously requires ERC to reimburse amounts MCCC paid to its insureds to cover the insureds' attorney fees in the declaratory judgment actions. ERC contends that the Agreement unambiguously imposes no such obligation. We disagree with both, reverse the district court's summary judgment on the issue in favor of MCCC, and remand for further proceedings to resolve the meaning of Agreement language that we hold to be ambiguous in this context.

As for MCCC's own attorney fees incurred in the declaratory judgment action, we affirm the district court's ruling that under the contractual language presented to the district court, ERC must reimburse these attorney fees as "claim expenses."

With respect to the third challenged item—MCCC's payment of the insureds' attorney fees incurred in defending the underlying tort claims—we reverse the district court and hold that ERC need not reimburse MCCC for those

payments as "loss." Rather, those payments should be treated as "claim expenses" for which ERC need make only a proportionate payment.

We also address several additional issues, including the Agreement's characterization of postjudgment interest as "loss" or "claim expenses," the percentage rate at which damage payments should be included as "loss" under the Agreement, prejudgment interest, a discovery dispute, and a cross-appeal by MCCC for attorney fees in this action.

## I.    BACKGROUND

### A.    Description of Reinsurance Agreement

Reinsurance is essentially insurance for insurance companies. Spreading part of the risk to the reinsurer can prevent a catastrophic loss from falling upon the insurance company and enable the insurance company to serve more clients. See, e.g., Unigard Sec. Ins. Co., Inc. v. North River Ins. Co., 4 F.3d 1049, 1053 (2d Cir. 1993). Unlike typical insurance contracts that are offered on a take-it-or-leave-it basis, reinsureds ordinarily negotiate the terms, conditions, and rates in their reinsurance contracts.

For nearly 30 years MCCC purchased reinsurance coverage from ERC. From January 1, 1994, until April 1, 2000, ERC and MCCC operated under the Agreement whose meaning is at issue in this appeal.

-4-

The Agreement required ERC to reimburse MCCC for all "loss" in excess of $300,000 for each occurrence, with a reinsurance limit of $1,000,000 for each occurrence. Additionally, the Agreement required ERC to reimburse MCCC for "claim expenses" at a rate equal to the fraction of the "loss" for which ERC was responsible. If, for example, MCCC had to pay a "loss" of $500,000, ERC would have to reimburse MCCC for $200,000 of that "loss" ($500,000 - $300,000). Because ERC thus paid 40% of the total "loss" ($200,000/$500,000 = 40%), ERC would reimburse MCCC for 40% of the "claim expenses" MCCC incurred.

The parties dispute the meaning of the terms "loss" and "claim expenses" in the Agreement. Article VIII of the Agreement defines "loss":

The word "loss" shall mean only such amounts:

(a)     within applicable policy limits as are actually paid by [MCCC] in settlement of claims or in satisfaction of awards or judgments (including prejudgment interest and plaintiff's costs included in the judgment and subject with the judgment to the applicable policy limit);

(b)     equal to 80% of the amount paid by [MCCC] in excess of applicable third party liability coverage policy limits occasioned by liability imposed upon [MCCC] on account of the failure of [MCCC] to settle a claim for an amount within such policy limits;

(c)(1)     equal to 80% of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy if [ERC] has not, in

-5-

advance of any such conduct by [MCCC] counseled with [MCCC] and concurred in [MCCC's] course of conduct; or

(c)(2)    equal to 100% of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy if [ERC] has, in advance of any such conduct by [MCCC] counseled with [MCCC] and concurred in [MCCC's] course of conduct.

App. 600.  For the dispute before us, the relevant part of the definition appears in paragraphs (c)(1) and (c)(2), which require ERC to reimburse MCCC for "compensatory damages . . . arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy."  (A subsidiary dispute concerns whether it is (c)(1) or (c)(2) that applies.)

"Claim expenses" are defined in Article VIII of the Agreement as follows:

The term "claim expenses" shall mean all payment under the supplementary payments provisions of the [MCCC] policy, including court costs, interest upon judgments, and allocated investigation, adjustment and legal expenses."

App. 601.  As presented to the district court, the pertinent part of the supplementary payments provisions incorporated by reference from insurance policies issued by MCCC states:

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle or "suit" against an insured we defend:

-6-

a. All expenses we incur.

. . . .

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

App. 526-27.

## B. The District Court's Ruling

The payments and expenses at issue in this litigation arose out of other lawsuits: tort actions against MCCC insureds, and declaratory judgment actions between MCCC and its insureds to determine MCCC's responsibility to provide coverage with respect to the tort actions. As a result of the declaratory judgment actions, MCCC had to pay its insureds' attorney fees in the declaratory judgment actions, had to pay its own attorney fees for attorneys representing MCCC in the declaratory judgment actions, and had to reimburse its insureds for the damages awarded in the underlying tort actions and for the fees incurred by the insureds for legal representation in the tort action.

The lawsuit between MCCC and ERC involves whether ERC must reimburse MCCC for these costs and expenses. After ERC had reimbursed MCCC for payments and expenses arising out of four declaratory judgment actions, it brought this diversity action for return of the reimbursements. MCCC counterclaimed for reimbursement of payments and expenses arising out of three other declaratory judgment actions.

The district court granted MCCC summary judgment against ERC with respect to MCCC's payment of its insureds' attorney fees and expenses in the declaratory judgment actions. The court ruled that "the plain and ordinary meaning of the term 'compensatory damages' included attorney fees and costs" and that the declaratory judgment fees and expenses arose "out of MCCC's conduct in failing to pay or delaying payment of benefits under the policy." App. 2452. Therefore, it held, the insureds' attorney fees and expenses in the declaratory judgment actions fell within the Agreement's unambiguous definition of "loss." The district court also granted summary judgment to MCCC on its claim that ERC had to reimburse MCCC for a portion of MCCC's own attorney fees and expenses in the declaratory judgment actions, because those fees and expenses were "claim expenses" within the meaning of the Agreement.

After a subsequent trial the district court further held that ERC had to reimburse MCCC for MCCC's payment of attorney fees and expenses incurred by

its insureds in defending the underlying tort actions. The court stated that these payments by MCCC were "loss" within the meaning of the Agreement.

ERC appeals and MCCC cross appeals. We now proceed to address in turn the issues raised by the parties. We have jurisdiction under 28 U.S.C. § 1291.

## II. MEANING OF "LOSS" AND "CLAIM EXPENSES"

Most of the issues before us require determination of the meaning of "loss" and "claim expenses" under the Agreement. Because no facts are in dispute, we review *de novo* the district court's legal conclusions. See Dang v. UNUM Life Ins. Co. of Am., 175 F.3d 1186, 1189 (10th Cir. 1999). The parties agree that Oklahoma law governs the interpretation of the Agreement. Under Oklahoma law the court interprets an insurance contract in accordance with principles applicable to all contracts. First Bank of Turley v. FDIC, 928 P.2d 298, 302 & n.6 (Okla. 1996). "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting . . . ." 15 Okla. Stat. § 152. Ordinarily, this means that the contract should be construed according to the plain meaning of its language. Id. at §§ 154, 160. The court determines, as a matter of law, whether the contract is ambiguous. Pitco Production Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003). A contract is ambiguous if it is reasonably susceptible to more than one meaning. Id. at 545-46. "The mere fact

the parties disagree or press for a different construction does not make an agreement ambiguous." Id. at 545.

If the court finds the contract to be unambiguous, it then interprets the contract as a matter of law. Id. at 545. If the court cannot determine the intent of the parties from the contract itself (that is, if the contract is ambiguous), the court may look to "the circumstances under which [the contract] was made, and the subject-matter to which it relates." Sinclair Oil & Gas Co. v. Bishop, 441 P.2d 436, 442-43 (Okla. 1967); see 15 Okla Stat. § 163; see also Lum v. Lee Way Motor Freight, Inc., 757 P.2d 810, 815 (Okla. 1987) ("Whether a contract is ambiguous so as to require extrinsic evidence or *whether the language is ambiguous and hence permits consideration of surrounding circumstances* are questions of law for the court." (emphasis added)). But cf. Restatement (Second) of Contracts § 202 (1981) (language of contract should be interpreted "in light of all the circumstances"); id. cmt. a (this rule "do[es] not depend upon any determination that there is an ambiguity."). If interpretation of an ambiguous contract "depends upon extrinsic facts as to which there is a dispute, its construction is a mixed question of law and fact, and is for the jury . . . ." Brogden v. Perryman, 56 P.2d 398, 399 (Okla. 1936) (internal quotation marks omitted); see Polk v. Bartlett, 365 P.2d 987, 989-90 (Okla. 1961).

### A. Insureds' Attorney Fees and Expenses in Declaratory Judgment Actions

We first consider whether the Agreement requires ERC to reimburse MCCC for MCCC's payment of its insureds' attorney fees and expenses in the declaratory judgment actions. The resolution of this issue turns on whether the Agreement includes such payments within the definition of "loss." Each party contends that the Agreement is unambiguous. Rejecting their views, we hold that the language of the Agreement is, as a matter of law, ambiguous on this point. The pertinent part of the Agreement's definition of "loss" is as follows:

> The word "loss" shall mean only such amounts:
>
> . . . .
>
> paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy. . . .

Article VIII, ¶¶ (c)(1), (c)(2), App. 600. As do the parties, we focus on the phrase "compensatory damages awarded to the insured." The Agreement does not define "compensatory damages." MCCC urges that the insureds' attorney fees and expenses in the declaratory judgment actions constitute "compensatory damages." ERC contends that the attorney fees and expenses are not "compensatory damages," but rather "litigation costs" for which it need not reimburse MCCC.

Before analyzing the phrase, we consider an argument by ERC that appears to make the intent of the parties irrelevant. ERC asserts that although Oklahoma law governs the interpretation of the Agreement, the Full Faith and Credit Clause of the United States Constitution requires that Texas law govern whether the attorney fees and expenses are "loss" or "litigation costs." Because the amounts at stake were awarded in Texas courts, it argues, the Texas courts' characterization of these amounts—as compensatory damages, costs, or otherwise—is entitled to full faith and credit in other States. Thus, ERC concludes, we are bound by Texas law declaring that the judgments awarded by the Texas courts were "litigation costs" rather than "compensatory damages."

We disagree. The parties to the Agreement could define "compensatory damages" as they saw fit, without regard to the characterization by the State in which judgment had been entered. The Full Faith and Credit Clause is simply irrelevant to the issue before us. The Full Faith and Credit Clause states: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const. Art. IV § 1. Although federal judicial proceedings are not expressly included within the Clause, the "Clause . . . and its implementing statute, 28 U.S.C. § 1738, as well as interstitial federal

common law, dictate that courts in the United States, both state and federal, must recognize and give effect to valid judgments rendered by other courts in the United States, including state and federal courts." 18 Moore's Federal Practice § 130.01 (Matthew Bender 3d ed.).

In other words, roughly speaking, a judgment must be given the same legal effect in every court within this country. If, for example, a Texas court had interpreted the meaning of "compensatory damages" in the Agreement between ERC and MCCC, that interpretation would have the same preclusive effect in Oklahoma, or federal, litigation that it would have in litigation in a Texas state court. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 222 (1985) ("The full-faith-and-credit statute requires that federal courts give the same preclusive effect to a State's judicial proceedings as would the courts of the State rendering the judgment . . . ." (emphasis omitted)). Here, however, no Texas judgment has interpreted the term "compensatory damages" in the Agreement, so no Texas judgment is binding with respect to the meaning of that term. Of course, the Agreement could have provided that the term should be construed in accordance with the law of the State where the underlying judgment was entered. But ERC does not argue for such a construction. The full-faith-and-credit requirement does not restrict the parties' right to define contractual terms as they wish. At oral argument ERC properly conceded that if Texas law conflicted with an explicit

-13-

definition in the Agreement, the Agreement would control.  In short, ERC's reliance on the Full Faith and Credit Clause is misplaced.

The district court ruled that "compensatory damages" unambiguously includes attorney fees.  After noting that attorney fees are sometimes awarded as costs and sometimes as compensatory or punitive damages, it said that the label is unimportant.  Citing our decision in Prudential Insurance Company of America v. Carlson, 126 F.2d 607, 611 (10th Cir. 1942), which held that an award of attorney fees is a substantive right for purposes of choice-of-law analysis, the court reasoned that such an award "is intended to compensate the prevailing party," and thus is "compensatory damages" within the definition of the term in Webster's Third New International Dictionary 463 (1986) ("compensatory damages" are "damages awarded to make good or compensate for an injury sustained").  The court concluded, "[T]he plain and ordinary meaning of the term 'compensatory damages' includes attorneys' fees and costs."  App. 2452.

In support of the district court's ruling, MCCC cites a legal dictionary that states: "Compensatory damages are such as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury.  Damages awarded to a person as compensation, indemnity, or restitution for harm sustained by him."  Black's Law Dictionary 390 (6th ed. 1990).  MCCC argues that an award of the insured's

declaratory judgment expenses is intended to make the insured whole for all the expenses it has incurred in enforcing the insurer's duty to defend and indemnify it with respect to the underlying claim. Thus, MCCC concludes, the insured's declaratory judgment expenses constitute "compensatory damages," which compensate for an improper denial of coverage.

To challenge the district court's ruling, ERC also relies on a dictionary, the same one that the district court quoted. ERC argues that attorney fees are clearly included within the definition of "costs":

> **4. Costs** *pl*: expenses incurred in litigation: as **a:** those payable to the attorney or counsel by his client esp. when fixed by law **b:** those given by the law or the court to the prevailing against the losing party in equity and frequently by statute–called also *bill of costs* .

Webster's, *supra* , at 515. Consequently, ERC asserts, attorney fees are "litigation costs," not "compensatory damages."

We do not see the issue as so clear-cut as the parties seem to. The difficulty here is that payment of attorney fees undoubtedly "compensates" the prevailing party for losses ultimately caused by the opposing party's wrongdoing, but such fees can also be considered as simply the cost of recovering "compensatory damages"—a cost which is not itself considered to be part of compensatory damages and is therefore not recoverable. After all, the American Rule (which is followed in Oklahoma, see Kay v. Venezuelan Sun Oil Co. , 806 P.2d 648, 650 (Okla. 1991)) ordinarily bars the recovery of attorney fees by the

-15-

prevailing party in litigation, on the theory that such fees are a cost of recovering damages, not damages in themselves.    See, e.g. , St. Peter's Church v. Beach  , 26 Conn. 355, *8 (Conn. 1857) ("Now the expenses of litigation are never damages sued for in any case when the action is brought for the wrong itself, not even if the tort be wanton or malicious.  They are not the natural and proximate consequence of the wrongful act, which is the universal rule, but are remote, future and contingent." (internal quotation marks omitted)).

Both of these strains of thought—that attorney fees are compensatory damages or are only unrecoverable costs of litigation to recover compensatory damages—are reflected in Oklahoma statutes and judicial opinions.  Some Oklahoma authority leads to the conclusion that attorney fees are "compensatory damages."  See, e.g. , Floyd v. Anderson  , 128 P. 249, 250 (Okla. 1912) ("[w]e think . . . that all actual damages, compensatory in their nature, such as . . . costs and expenses, including . . . a reasonable attorney's fee . . . .").  On the other hand, McAlester Urban Renewal Authority v. Hamilton   , 521 P.2d 823, 826 (Okla. 1974), held that interest on costs, including attorney fees, was not recoverable, whereas interest on damages was.    See also  59 Okla. Stat. § 858-604(A) ("For purposes of this subsection, attorney fees and costs shall not be considered as or included in actual or compensatory damages.").  There appears to be no all-

-16-

encompassing Oklahoma rule that attorney fees are or are not "compensatory damages."

Thus, we cannot hold the term "compensatory damages" in the Agreement to be unambiguous with respect to whether it includes or excludes attorney fees. The term is reasonably susceptible to more than one meaning.

To break the standoff between the alternative plausible interpretations of "compensatory damages," MCCC argues that ambiguous contract language must be construed against its drafter. This rule of interpretation, often referred to as *"contra proferentem*," is particularly suitable for standard insurance contracts where the insured does not have an opportunity to negotiate or bargain. The rule is less appropriate in reinsurance agreements, however, because the parties typically have comparable bargaining power in negotiating the terms of their contracts. For this reason some courts have declined to apply the rule to reinsurance contracts. See, e.g. , Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1064-65 (2d Cir. 1993).

In any event, Oklahoma appears to have codified the rule. An Oklahoma statute states: "In cases of uncertainty not removed by the preceding rules [15 Okla. Stat. §§ 151-69], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party. . . ." 15 Okla. Stat. § 170. Yet the statute itself, as

well as courts construing the statute, state that this rule is to be applied only when the ambiguity has not been "removed by the preceding [statutory] rules." Id; see, e.g., Cities Service Oil Co. v. Geolograph Co., Inc., 254 P.2d 775, 782 (Okla. 1953). Among the preceding rules is 15 Okla. Stat. § 163, which states that "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Accordingly, a court should not resort to the doctrine of *contra proferentem* until the parties have an opportunity to present the circumstances surrounding the execution of the contract and other relevant evidence, such as custom in the industry. See Restatement (Second) of Contracts § 202 (setting forth types of evidence appropriate to consider in construing contracts). That opportunity should be afforded the parties here.

We therefore remand this issue to the district court for further proceedings regarding the meaning of "compensatory damages" in the Agreement.

### B. MCCC's Own Attorney Fees Incurred in Declaratory Judgment Actions

We next address whether the Agreement requires ERC to indemnify MCCC for MCCC's *own* attorney fees and expenses associated with the declaratory judgment actions. The answer turns on whether these attorney fees and expenses constitute "claim expenses" within the meaning of the Agreement. The district court held that MCCC's attorney fees and expenses were such "claim expenses"

and therefore were subject to proportionate reimbursement as provided in the Agreement.

The Agreement defines "claim expenses" to "mean all payment under the supplementary payments provisions of [MCCC's] policy, including court costs, interest upon judgments, and allocated investigation, adjustment and legal expenses." This definition incorporates by reference the supplementary payments provisions of MCCC's policies with its insureds.

The "Statement of Uncontroverted Facts" in ERC's memorandum in support of its motion for summary judgment contained what it asserted to be the language of the supplementary payments provisions. MCCC's response stated that the assertion was "uncontroverted." App. 1673 ¶ 7. The pertinent part of that language is as follows:

SUPPLEMENTARY PAYMENTS–COVERAGES A AND B

> We will pay, with respect to any claim we investigate or settle or "suit" against an insured we defend:
>
> A.      All expenses we incur
>
> . . . .
>
> These payments will not reduce the limits of insurance.

The district court held:

A plain reading of the supplementary payments provision indicates that it covers MCCC's declaratory judgment fees and expenses. The provision provides that MCCC will pay all expenses which it incurs with respect to any claim that it *investigates*. Certainly, MCCC investigated the claims for which it litigated coverage. Moreover, the fees and expenses which MCCC incurred in the declaratory judgment proceedings are expenses which it incurred with respect to such claims. Accordingly, the declaratory judgment fees and expenses fall within the plain and ordinary meaning of the supplementary payments provision.

App. 2454 (emphasis added).

We agree with the district court that "claim expenses," which include "all payments under the supplementary payments provisions of [MCCC's] policy," thus covers MCCC's declaratory judgment attorney fees and expenses. MCCC investigated the claims that formed the basis of the declaratory judgment actions. MCCC incurred attorney fees and expenses with respect to those claims. Hence, the declaratory judgment attorney fees and expenses fall within the unambiguous language of the supplementary payments provisions. ERC must reimburse MCCC for those "claim expenses" at the contractually provided proportionate rate.

ERC contends that this construction of the language makes the words "settle or 'suit' against an insured we defend" superfluous, because any case that is settled or involves a suit must also be investigated. Citing Bituminous Casualty Corporation v. Cowen Construction, Inc., 55 P.3d 1030, 1034 (Okla. 2002), ERC

relies on the general proposition that courts should avoid construing a document in such a way as to render some of the language surplusage. ERC suggests:

> A more reasonable construction of the supplementary payments provision . . . is that MCCC will pay all expenses that it incurs with respect to any suit against an insured that it defends. It also will pay all pre-suit expenses that it incurs with respect to any claim that it investigates or settles. This construction makes sense. A provision that MCCC will pay its own expenses in any suit where MCCC defends its insured leaves MCCC's insureds liable for all expenses incurred when MCCC settles a claim before suit is filed. The addition of the "investigate or settle" language would provide coverage for those pre-suit expenses.

Aplt. Br. at 42.

But ERC's construction does not avoid the surplusage problem. First, the words "or settle" serve no purpose, since it is impossible to believe that MCCC would settle a claim without having investigated it. Moreover, although ERC's argument explains why the words "any claim we investigate" would need to be added to the words "'suit' against an insured we defend," it does not explain why, once the words "any claim we investigate" are in the MCCC policy, there is any need to retain the words "or 'suit' against an insured we defend." At times, no reasonable interpretation of contract language can avoid rendering some of the language surplusage. ERC's construction of the policy language here has no advantage over the natural reading insofar as avoiding surplusage is concerned.

-21-

ERC's principal argument on appeal, however, avoids the difficulty of construing the above-quoted language. It points out that the quoted language is not the actual language of the supplementary payments provisions in the MCCC policies at issue. Rather than saying, "We will pay, with respect to any claim we investigate or settle or 'suit' against an insured we defend," the provisions say, "We will pay, with respect to any claim or 'suit' we defend."

The problem with this argument is that it was never presented to the district court. It is well settled that "[i]f a party fails to raise an issue in the trial court, it is deemed waived on appeal unless plain error is demonstrated." Hynes v. Energy West, Inc., 211 F.3d 1193, 1201-02 (10th Cir. 2000).

The role of plain error in civil litigation is very limited. There is no "plain error" provision in the rules governing civil matters except with respect to erroneous instructions, see Fed. R. Civ. P. 51(d)(2) (2003 amendment), and rulings on evidence, Fed. R. Evid. 103(d). Yet we have recognized the possibility of plain error in other circumstances. See Quigley v. Rosenthal, 327 F.3d 1044, 1063 (10th Cir. 2003); Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2472 (2d ed. 1995) ("[A]lthough the Civil Rules . . . do not contain a formal provision allowing the appellate courts to notice plain error, the appellate courts have held in a few cases that despite the absence of an objection

they may consider an error so fundamental that it may have resulted in a miscarriage of justice.")

In reviewing for plain error, we have used the standard applied in criminal proceedings. Federal Rule of Criminal Procedure 52(b) states: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b) (2002). As pointed out by the Supreme Court, "Rule 52(b) is permissive, not mandatory. If the forfeited error is 'plain' and 'affect[s] substantial rights,' the court of appeals has authority to order correction, but is not required to do so." United States v. Olano, 507 U.S. 725, 735 (1993). "[T]he discretion conferred by Rule 52(b) should be employed in those circumstances in which a miscarriage of justice would otherwise result." Id. at 736 (internal quotation marks omitted). The doctrine is limited to "correct[ing] a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and bracket omitted). Accord Quigley, 327 F.3d at 1063. Establishing entitlement to plain-error relief "is an extraordinary, nearly insurmountable burden." Quigley, 327 F.3d at 1063

In our view, several factors combine to make this an inappropriate occasion to grant relief under the plain-error doctrine. First, the error was not an action or omission by the district court; it was an error by the parties. In their summary-

judgment pleadings, ERC misquoted the policy language and MCCC responded that the quote was accurate. To be sure, ERC provided the district court with copies of the policies, which contained the correct language. ERC, however, miscited the record; it referred to "page 6" of the contracts, but the pertinent language is not on any page numbered "6" in any of the contracts. Of course, the district court could have searched the record to verify the accuracy of language to which the parties stipulated. But courts could never complete their work if they have the burden of engaging in such time-consuming activity—activity that would be totally fruitless if attorneys performed their duties adequately.

Second, ERC had ample opportunity to bring the error to the district court's attention. The district court, relying on the language provided by ERC, granted summary judgment with respect to recovery of MCCC's own declaratory-judgment attorney fees on May 23, 2002. Trial on the issues not resolved by summary judgment was on June 18, 2002, almost a month later. ERC could also have alerted the district court to the matter by a post-trial, or even post-judgment, motion.

Third, the alleged error here does not concern any matter of significant public policy. We are dealing with a private contract dispute in a business relationship. And fourth, we are not certain whether the result we reach would be

different under the language now presented to us by ERC. The proper construction of ERC's "new" language is not obvious.

In short, the judicial proceeding below was fair, and the error (by the parties) should not raise serious doubts about the integrity of that proceeding or bring disrepute upon the district court. We therefore affirm the district court on this issue.

### C. MCCC's Reimbursement of its Insureds' Attorney Fees Incurred in Underlying Tort Actions

ERC does not dispute that it must partially reimburse MCCC for amounts that MCCC paid its insureds for their defense costs in the underlying tort actions (in which MCCC should have provided a defense and did not). The parties dispute what the amount of the reimbursement should be. The specific disagreement is whether the insureds' attorney fees constitute "loss" under the Agreement, or merely "claim expenses." Under the Agreement ERC reimburses MCCC at a different rate for "loss" than for "claim expenses."

We hold that MCCC's payment of an insured's attorney fees in defending a third-party claim is a "claim expense" under the Agreement. ERC need only reimburse MCCC at the contractual proportionate rate.

The relevant portion of the "loss" definition provides:

The word "loss" shall mean only such amounts:

. . . .

paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of MCCC in the investigation, trial, or settlement of any claim or failure to pay or delay in payment of any benefits under any policy . . . .

Article VIII, ¶¶ (c)(1), (c)(2), App. 600.   There are two requirements for a payment to constitute "loss."  First, the payment must be for "punitive, exemplary, or compensatory damages."  Second, it must "aris[e] out of the conduct of MCCC in the investigation, trial, or settlement of any claim or failure to pay or delay in payment of any benefits . . . ."  Here, the amounts paid do not arise out of MCCC's conduct.

The amounts at issue are fees for attorneys to represent the insureds in the underlying tort litigation.  These fees were a consequence of the underlying litigation, not of any conduct by MCCC.  Whatever MCCC's conduct had been in the "investigation, trial, or settlement" of the claim, attorneys would be needed to represent the insured in the tort action.    Perhaps the fees for attorneys to defend the tort actions would have been less if MCCC had hired and paid for the attorneys (because of lower hourly rates, more efficient conduct of the defense, or even earlier resolution by settlement), but the fees might also have been greater (higher hourly rates, greater willingness to "play hard ball," etc.).  Regardless, the payments to attorneys for the insured in the tort action do not "arise out of the

-26-

conduct of MCCC."  Rather, they arise out of the fact that a third party sued the insured.

We are reinforced in this interpretation of the Agreement by the observation that adopting MCCC's interpretation—that the payments constitute "loss"—would create a perverse incentive for MCCC when the "loss" would otherwise approach the $300,000 retention threshold.  There is no dispute that if MCCC had provided attorneys to defend its insureds in the underlying tort actions, the fees and expenses it incurred would have been treated under the Agreement as "claim expenses."  ERC would have been required to reimburse MCCC for these "claim expenses" at the contractual proportionate rate, once the "loss" exceeded $300,000.  In other words, MCCC would receive, at most, partial payment from ERC.  A "loss," however, is fully reimbursable by ERC (once the $300,000 threshold is passed).  Thus, if MCCC is correct that payment to the insured for hiring its own attorneys is a "loss," then MCCC would have a financial incentive to refuse to pay for a defense of its insureds.  It would usually end up paying less out-of-pocket (after reimbursement from ERC) if it paid its insured for having hired an attorney than if it hired an attorney itself to represent the insured.  This is a highly unlikely intent of the parties, and the result might well violate public policy favoring the honoring of insurance contracts because MCCC could be induced to refuse to provide an attorney for its insured.

-27-

We therefore reverse the district court and hold that MCCC's payments of its insureds' attorney fees incurred in the underlying tort actions should be treated as "claim expenses."

### D. Safe Tire Claim/Postjudgment Interest

One of MCCC's claims for reimbursement arises from its payments to its insured, Safe Tire Disposal Corporation. ERC argues that MCCC is not entitled to any reimbursement on the Safe Tire claim, because MCCC's "loss" on the claim does not exceed MCCC's $300,000 retention. The validity of this argument turns on whether postjudgment interest is a "loss" or a "claim expense." We hold, as ERC contends, that such interest is a "claim expense."

MCCC requested reimbursement for the following amounts with respect to the Safe Tire claim: (1) $208,500 for funds MCCC paid to claimants in the underlying lawsuit; (2) $80,432.53 awarded to Safe Tire to reimburse it for attorney fees incurred in the underlying lawsuit; (3) $53,530 awarded to Safe Tire to reimburse it for attorney fees it incurred in the declaratory judgment action; (4) $15,000 awarded to Safe Tire to reimburse it for attorney fees it incurred on the appeal of the declaratory judgment action; and (5) $36,467.25 for postjudgment interest awarded to Safe Tire in the declaratory judgment action. ERC concedes that the $208,500 is "loss." As for item (2), we have already held that the $80,432.53 for attorney fees incurred by the insured in the underlying action was

a "claim expense," not a "loss." <u>See supra</u> section II. C. Regarding items (3) and (4), we are remanding to the district court the question whether reimbursement of the insured's declaratory judgment attorney fees and expenses constituted "loss," <u>see supra</u> section II. A; but even if we assume that they should be considered "loss," the total for items (1), (3), and (4) is just $277,030. Thus, the "loss" exceeds MCCC's retention threshold only if the postjudgment interest of $36,467.25 is included. For the following reasons we hold that the postjudgment interest is not "loss," so the Safe Tire "loss" is less than $300,000.

The district court treated the postjudgment interest as "loss," just as it treated the declaratory judgment fees and expenses themselves. ERC disputes that ruling, arguing that postjudgment interest on the attorney fees awarded to MCCC's insureds are "claim expenses." ERC asserts that postjudgment interest is covered explicitly by the supplementary payments provisions of MCCC's policies, which are incorporated into the definition of "claim expenses." The pertinent language of the supplementary payments provisions (as provided to the district court) states:

> We will pay, with respect to any claim we investigate or settle or "suit" against an insured we defend:
>
>     a.    all expenses we incur.
>     . . . .

g.      All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in a court the part of the judgment that is within the applicable limit of insurance.

App. 526-27.

We agree with ERC. The "claim expenses" language clearly includes postjudgment interest. (We note that ERC's previously mentioned error in quoting the MCCC policies has no bearing on this issue.) Not only is ERC's position supported by the plain language of the Agreement (together with the supplementary payments provisions), but it also makes sense. If postjudgment interest were considered a "loss," MCCC would have an incentive not to pay a judgment owed to an insured near or above $300,000. Delay in payment could result in sufficient interest being due that the $300,000 retention would be exceeded; and once the retention threshold was reached, ERC would have to pay all subsequently accruing interest. Delay would be an unmitigated boon to MCCC, because the cost of the delay (accruing interest) would be borne solely by ERC. It would be remarkable if ERC agreed to such a result, which would also seem to violate public policy in favor of prompt payment of insurance claims.

As a result of determining that postjudgment interest is a "claim expense," we hold that MCCC cannot satisfy the $300,000 retention for the Safe Tire claim.

## E. Does "Loss" Include 80% or 100% of Payments Arising from the Declaratory Judgment Actions?

Under the Agreement, when MCCC makes certain payments for damages, the "loss" includes either 80% or 100% of the payments, depending on whether ERC agreed to the conduct causing the damages. The relevant provisions of the "loss" definition state that "loss" is:

(c)(1)      equal to *80%* of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy *if [ERC] has not, in advance of any such conduct by [MCCC] counseled with [MCCC] and concurred in [MCCC's] course of conduct*; or

(c)(2)      equal to *100%* of the amount paid by [MCCC] for punitive, exemplary, or compensatory damages awarded to the insured and arising out of the conduct of [MCCC] in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy *if [ERC] has, in advance of any such conduct by [MCCC] counseled with [MCCC] and concurred in [MCCC's] course of conduct*.

App. 600 (emphasis added).

ERC challenges on appeal the district court's ruling with respect to three claims that ERC had "counseled and concurred" in MCCC's course of conduct in denying coverage to its insureds, thereby triggering paragraph (c)(2) and inclusion of the payments at a rate of 100%. The court based its ruling on the following

-31-

stipulated facts: (1) "ERC . . . counseled with [MCCC] and concurred in [MCCC's] course of conduct after the date of filing of any declaratory judgment actions" and (2) "ERC never advised [MCCC] orally or in writing that [MCCC] had not counseled with ERC and that ERC had not concurred in [MCCC's] course of conduct." App. 2650. After trial the district court decided: "Under the language of (c)(2), the Court finds that MCCC did counsel with ERC in advance of the investigation, trial or settlement of the three claims at issue and that ERC concurred in MCCC's course of conduct in the three claims." App. 2539.

ERC's sole appellate claim on this issue is that for the damages to be included as "loss" at the 100% rate, the counseling and concurrence must have occurred before the first step in MCCC's course of conduct—that is, before MCCC filed the declaratory judgment action. MCCC responds that it sufficed for the counseling and concurrence to occur before the last step in its course of conduct—when the declaratory judgment action concluded.

We disagree with both parties. As we read the plain language of the Agreement, the percentage treated as "loss" depends upon whether the damages arose from conduct predating ERC's concurrence in the course of conduct. Some damages could have arisen from conduct predating ERC's concurrence in the course of conduct and some could have arisen from conduct postdating such concurrence. For example, much of an insured's attorney fee in the declaratory

-32-

judgment action could have been incurred after ERC approved of MCCC's bringing the action, even if approval did not precede filing of the action. Thus, it is likely that some of the payments for damages in this case should be included as "loss" at an 80% rate and some at a 100% rate. The district court seemed to read the Agreement as we do when it expressed its views during argument on the matter. The parties, however, did not give the district court sufficient information to apportion the payments precisely. The stipulations establish only that at some point ERC "counseled and concurred in [MCCC's] conduct." There is no stipulation regarding what, if any, damages occurred as a result of conduct preceding concurrence or what occurred after concurrence. In any event, we reject ERC's contention that all payments must be included at only the 80% rate because it had not approved of the declaratory judgment actions before they were filed. (Perhaps the district court also relied on ratification principles, but we need not reach that issue.)

We therefore affirm the district court's ruling. If the district court determines on remand (as discussed      supra, part II (A)) that MCCC's payments of its insureds' attorney fees in the declaratory judgment actions constitute payments for "compensatory damages," and therefore that Article VIII(c) of the Agreement applies, it should treat these payments as provided in paragraph (c)(2).

## III.   OTHER ISSUES

### A.   Prejudgment Interest

ERC disputes whether the district court was correct in awarding MCCC prejudgment interest on damages awarded by the court.  Because the issue is one of statutory interpretation, our review is *de novo*.  United States v. Telluride Co., 146 F.3d 1241, 1244 (10th Cir. 1998).  The parties agree that 23 Okla. Stat. § 6 governs the award of prejudgment interest.  That statute provides:

> Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

23 Okla. Stat. § 6.

We have interpreted this statute to mean that when a *factual* finding must be made to determine the precise amount of damages recoverable, then prejudgment interest is not appropriate.  Chesapeake Operating, Inc. v. Valence Operating Co., 193 F.3d 1153, 1156 (10th Cir. 1999).  Prejudgment interest is appropriate in a contract dispute, however, when the amount of damages is undisputed but a court must make a legal determination whether those damages are recoverable under the contract.  Id.

-34-

This case presents an unusual situation because the amounts of the payments for which MCCC seeks reimbursement are undisputed but a factual finding was necessary to determine whether payments would be included as reimbursable "loss" at a rate of 80% or 100%. Thus, 80% was "certain" within the meaning of the statute. Only the remaining 20% turned on a fact question. We hold that MCCC is entitled to prejudgment interest on the amount of the judgment against ERC that would have been awarded if damage payments had been included as "loss" at an 80% rate.

As for the remainder of the judgment, we hold that MCCC is not entitled to receive prejudgment interest. To be sure, the facts regarding when ERC counseled and concurred in MCCC's conduct—the facts that determined whether damage payments should be included as "loss" at a rate of 80% or 100%—were not in dispute at trial. They were, however, disputed until the day of trial. On the day of trial ERC and MCCC entered into their stipulation regarding when ERC "counseled and concurred" in MCCC's conduct. Before that stipulation, questions of fact remained and damages were not "certain or capable of being made certain by calculation." Indeed, less than a month before trial the court denied summary judgment on this issue, stating: "Questions of fact remain as to whether ERC counseled in advance with MCCC and concurred in MCCC's course of conduct. Therefore the Court cannot determine on this record whether MCCC

may recover 80 per cent of its fees and expenses under paragraph (c)(1) or 100 per cent under paragraph (c)(2)." App. 2452.

In this circumstance, we believe that the facts stipulated at trial should be treated as resolved at trial. To hold otherwise would discourage parties from stipulating to facts, a beneficial practice that conserves time and scarce judicial resources. Therefore, we hold that MCCC is not entitled to prejudgment interest on the portion of the judgment that depended on a favorable resolution of when ERC "counseled and concurred."

## B. Privilege

ERC asserts that four documents it was ordered to produce during discovery were protected by the attorney-client and work-product privileges. The district court compelled ERC to produce these documents because it found ERC's privilege log inadequate to enable the court to determine whether the documents were privileged. We need not, however, address this issue. We do not review district court rulings that do not affect the result. Griffin v. Davies, 929 F.2d 550, 554 (10th Cir. 1991). ERC acknowledges that the district court did not rely in any way on the four documents in arriving at the judgment challenged on appeal. It argues, however, that if we reverse and remand, the documents may become relevant. Perhaps. But ERC has not pointed to any issue on which the documents may be (or even lead to) admissible evidence. In this circumstance,

-36-

we will not undertake the likely unnecessary effort of reviewing the rulings regarding the documents.

### C.    MCCC Cross-Appeal

MCCC appeals the district court's decision not to award it attorney fees incurred in this litigation.  We affirm because MCCC's argument on appeal is not the one it presented to the district court.      See, e.g. , Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.    , 100 F.3d 792, 798-99 (10th Cir. 1996) (court will not consider a new theory on appeal, even one "that falls under the same general category as an argument presented at trial"(internal quotation marks omitted)),  *opinion amended on other grounds*   , 103 F.3d 80 (10th Cir. 1996).

MCCC relies on 12 Okla. Stat. § 936.  When the district court rendered judgment the statute provided:

> *In any civil action to recover on an* open account, a statement of account, account stated, note, bill, negotiable instrument, or *contract* relating to the purchase or sale of goods, wares, or merchandise, or *for labor or services*, unless otherwise provided by law or the contract which is the subject of the action, *the prevailing party shall be allowed a reasonable attorney fee* to be set by the court, to be taxed and collected as costs.

12 Okla. Stat. § 936 (2002) (emphasis added).  In district court MCCC argued that the Agreement was a contract for services because ERC provided various services, including same-day processing of reimbursement requests; assistance in locating defense counsel; providing information on plaintiffs' attorneys, local

-37-

values, and jury trends; and providing advice on pursuit of declaratory judgment actions.

On appeal MCCC still claims that this suit is to recover on a contract for services, but it no longer refers to services by ERC. Instead, the services it refers to are services provided by attorneys hired by MCCC to represent it in the declaratory judgment actions with MCCC's insureds. MCCC argues that because this litigation between MCCC and ERC dealt in part with MCCC's ability to recover from ERC sums that MCCC paid to the declaratory judgment attorneys, this lawsuit is a civil action to recover for services rendered, and MCCC is entitled to attorney fees it incurred in this lawsuit.

MCCC attempts to justify this switch in theories on the ground that the Oklahoma legislature recently amended the statute to clarify its meaning and to correct courts that had been incorrectly interpreting the statute. The newly amended version of § 936, enacted after the district court decided the attorney-fee issue, states:

> *In any civil action to recover for labor or services rendered*, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, *the prevailing party shall be allowed a reasonable attorney fee* to be set by the court, to be taxed and collected as costs.

12 Okla. Stat. § 936 (November 1, 2002) (emphasis added).  According to MCCC, this "clarification" supports an award of attorney fees under facts different from those argued to the district court.  To be sure, in some circumstances an appellate court may allow a party to raise an issue for the first time on appeal because of an intervening change in the law.  See United States v. Charley, 189 F.3d 1251, 1279 (10th Cir. 1999) (Holloway, J., concurring in part and dissenting in part).  But this is not such a circumstance.  As MCCC admits, any change in the Oklahoma statute was not applicable to this case.  As a result, MCCC's reference to the amended statute is simply to support its argument regarding what the law meant at the time it argued its theory to the district court.  The presence of this additional "evidence" cannot justify MCCC's switch with respect to the services it contends made this lawsuit a suit to recover for breach of a "contract . . . for . . . services."  We therefore refuse to consider MCCC's new theory.  See Bancamerica Commercial Corp., 100 F.3d at 798-99.  We affirm the district court's denial of attorney fees.

## IV.    CONCLUSION

We AFFIRM the district court's rulings that (1) MCCC's own attorney fees and expenses incurred in the declaratory judgment actions are "claim expenses"; (2) the payments for compensatory damages should be included as "loss" at a rate of 100%, not 80%; and (3) MCCC is not entitled to attorney fees associated with

this lawsuit.  We REVERSE the rulings that (1) payments for the insureds' attorney fees and expenses incurred in defending the underlying tort actions are "loss," rather than "claim expense"; and (2) MCCC is entitled to reimbursement for the Safe Tire claim.  We REMAND for further proceedings regarding (1) whether payments for the insureds' attorney fees and expenses incurred in the declaratory judgment actions constitute "loss" within the meaning of the Agreement; and (2) the award of prejudgment interest.  We do not address the privilege issue.